[No. H013171. Sixth Dist. May 31, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
KELVIN FARLEY, Defendant and Appellant.

COUNSEL

C. Elliot Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Mark S. Howell, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WUNDERLICH, J.—**

## I. *Statement of the Case*

Defendant Kelvin Farley appeals from a judgment entered after a jury found him guilty of first degree burglary and escape and also found true an allegation that he had suffered a prior serious felony conviction. On appeal he claims the court erred in giving an aiding and abetting instruction based on *People* v. *Montoya* (1994) 7 Cal.4th 1027 [31 Cal.Rptr.2d 128, 874 P.2d 903]. He claims the court gave a partially erroneous flight instruction and

also failed to limit its scope to the burglary charge. He claims the court erred in denying his request for complete transcripts of his first trial or, in the alternative, counsel was ineffective in failing to request complete transcripts. Finally, he claims he was entitled to more custody and good time/work time credit than the court allowed.

We reverse defendant's conviction for burglary and remand the matter for further proceedings, including a redetermination of custody credit.[1]

## II. *Facts*

### A. *The Burglary*

At noon on April 11, 1992, Barbara Somers and her family left their home in San Jose to go to a birthday party. When they left, the doors, windows, and side gate were closed and secure. Sometime later, their next door neighbor Jeffrey Bennett heard his dog bark. He went outside to investigate and saw a Hispanic man and a Black man in the Somerses' backyard near a sliding door. The Somerses' vehicles were not parked in front, and Bennett became suspicious. When he saw both men enter through a window, he called "911."

Officer Daniel McTeague of the San Jose Police Department responded within minutes. Directed by Bennett to the Somerses' house, McTeague saw a screen was off a window. There were pry marks on the screen that appeared to have been made by a screwdriver. McTeague approached and heard someone whisper " 'you carry' " and " 'hurry.' " Defendant then stepped outside, carrying various items under his arms and around his neck, including binoculars and a suitcase. He also had a screwdriver and was wearing socks on his hands. McTeague ordered defendant to the ground, and defendant complied. McTeague heard another person retreating inside and called for backup.

Within minutes additional officers arrived. Officer David Salazar handcuffed defendant, placed him in his patrol car, and read him his rights. Defendant was cooperative and did not appear to be under the influence of alcohol or drugs.[2] Defendant told Salazar that he and a friend had taken a bus to the house, which was his friend's, and that he had to wear the socks to enter.

Meanwhile, the police located Anthony Herrera on the floor in a bedroom closet and arrested him. After being read his rights, he simply said, " 'What

---

[1]Unless otherwise specified, all further statutory references are to the Penal Code.

[2]The parties stipulated that defendant's blood-alcohol level was .15 percent and he tested positive for opiates.

do you want me to tell you? You got me.'" He later admitted that he and "'[his] partner'" burglarized the house. Further investigation at the scene revealed that a car previously registered to defendant was parked down the street.

Herrera's probation officer Lynne Sidensol testified that she spoke to Herrera sometime after he had pleaded guilty to the burglary. Defendant was present. Herrera explained that he and defendant were knocking on doors in the neighborhood to find landscaping jobs. He said he and defendant spontaneously decided to burglarize the Somerses' home after knocking on the door and finding no one at home. Herrera did not suggest that defendant had nothing to do with the offense.

Defendant testified on his own behalf. He admitted being a heroin addict, having been arrested for being under the influence numerous times, and having pleaded guilty to a robbery in 1982.

He explained that on the morning of the burglary, he took three doses of an antiseizure drug and was drinking potent wine to relieve heroin withdrawal symptoms. He met Herrera at a market, and they injected some heroin. Herrera then asked for a ride to his aunt's house to pick up some property.

After directing defendant to a particular house, Herrera got out and told defendant to wait. Defendant drank some wine and fell asleep. Later, Herrera got back in the car and asked defendant for help. Herrera led defendant into the backyard and entered a window. Defendant followed him through the window. Defendant figured Herrera had no keys to the house because he had been kicked out. Defendant denied having a screwdriver with him at that time.

Inside, defendant fell asleep on a couch. After a while, Herrera woke him, gave him some socks, and told him to put them on his hands. Herrera had red socks on his hands. Defendant realized the purpose was to avoid leaving fingerprints and that he was now involved in something unlawful. Herrera loaded defendant's arms with property, placed binoculars around his neck, and put a screwdriver in his pocket. He held the drapes open for defendant and said "carry this and hurry." He then shoved defendant outside right in front of Officer McTeague. Defendant immediately sobered up.

Defendant said he later told Officer Salazar that he had come to help a friend move and he did not know anything criminal was going on. He said he lied about having arrived on a bus because he did not want to have his car towed.

Herrera testified that he met defendant at a market where heroin users congregate. He told defendant he had been thrown out of his aunt's house and that he had to go there to pick up his property. However, his real purpose was to commit a burglary and he intended to use defendant. He directed defendant to a house and told him to wait. Herrera may have had one or two screwdrivers with him. He knocked at the door and then went around to the back. He found an open window and removed the screen. He returned to defendant, who was in a daze, and asked for help. They returned to the backyard, where Herrera entered the window and defendant followed.

Inside, Herrera collected things and gave them to defendant, saying " 'take this.' " He directed defendant to put some socks on his hands, gave defendant a screwdriver, and told defendant to go outside. Herrera then hid.

Herrera denied telling Lynne Sidensol that he and defendant were knocking on doors and decided to burglarize the Somerses' home. He said he told her he committed the burglary. At the time he spoke to her, he was angry at defendant because defendant had been released and he thought defendant had "snitched" on him. He also testified that he and defendant argued in a holding cell and that others there heard him accuse defendant of being a snitch.

## B.  *The Escape*

On the morning of March 17, 1993, Officer Thomas Berg of the Santa Clara Department of Corrections at the Elmwood minimum security compound determined that defendant was missing from his bunk. Authorities later determined that he had escaped.

Defendant was later arrested in San Francisco. When authorities learned of an outstanding warrant based on defendant's escape, they notified the Santa Clara County Sheriff's Department. On March 29, 1994, Officer Steven Arredondo went to the jail in San Francisco to collect defendant. Defendant told Arredondo he escaped because he was going to "get into something with some guys from Elmwood."

Defendant testified that after he and Herrera were arrested, they argued in the holding cell and Herrera tried to fight him. Noting his numerous prior convictions, Herrera said defendant should take responsibility for the burglary. Herrera also accused defendant of being a "snitch" and said he was going to have defendant "hit." After Herrera was removed from the cell, another person said there was a "green light" on defendant, which defendant understood to mean that anyone could attack him.

Later, at Elmwood, a Black inmate showed defendant a knife and said the other Black inmates would not protect him because they did not want to clash with the Mexicans. He said they wanted defendant out. Defendant was transferred to a less secure barracks where he felt more threatened because there were fewer Blacks. He did not ask for protective custody because it implied he was a snitch or child molester.

The evening before his escape, some Mexicans threatened defendant's life and showed him weapons. The next night a group woke him. Two had weapons. They took him out a back door and told him to leave or he would be stabbed. It was raining. While climbing a second fence, he fell and broke his ankle. He crawled to Highway 17, where a car was waiting for him. A relative of Herrera's grabbed him and put him in the backseat. He was taken to a motel in San Francisco, where he stayed for a week. Later, he went to the hospital to have his ankle reconstructed. He was released to a homeless shelter and remained there for seven months. He said he checked on whether Herrera was still in jail and claimed he did not feel safe surrendering to police until he learned that Herrera had been sent to prison.

Officer Kenneth Blackmon of the Corrections Department testified that a note threatening defendant had been found in the jail. It read, " 'Inmate Farley will be fucked up if he stays in this dorm. For the inmate's safety, Farley should be rehoused.' "

### III.  *Retroactive Application of Montoya*

The burglary here occurred on April 11, 1992. At that time, a person could not be held liable for burglary as an aider and abettor unless he or she formed the intent to aid and abet before or during entry by the actual perpetrator. (*People* v. *Macedo* (1989) 213 Cal.App.3d 554, 558 [261 Cal.Rptr. 754]; *People* v. *Forte* (1988) 204 Cal.App.3d 1317, 1321-1322 [251 Cal.Rptr. 855]; *People* v. *Brady* (1987) 190 Cal.App.3d 124, 132-134 [235 Cal.Rptr. 248]; *People* v. *Markus* (1978) 82 Cal.App.3d 477, 481-482 [147 Cal.Rptr. 151]; see *People* v. *Escobar* (1992) 7 Cal.App.4th 1430, 1435-1436 [9 Cal.Rptr.2d 770].) The rule was embodied in former CALJIC No. 14.54 (1989 ed.), and in *People* v. *Brady, supra,* 190 Cal.App.3d at pages 133-134, the court found the failure to give this instruction reversible error.

In June 1994, the Supreme Court filed *People* v. *Montoya, supra,* 7 Cal.4th 1027, which abrogated the rule. *Montoya* held that for purpose of determining liability for burglary as an aider and abettor, a burglary is ongoing while the direct perpetrator remains inside the burglarized premises. (*Id.* at pp.

1043-1045.) Thus, one may be held liable if he or she aids and abets any time before the direct perpetrator leaves the premises. The court disapproved *Markus*, *Brady*, *Forte*, and *Macedo*, cited above, to the extent they conflicted with its holding. (*Id.* at p. 1040.)

The trial court here instructed the jury in accordance with *Montoya*. (See CALJIC No. 14.54 (1994 rev.).) Defendant contends the court should have given a pre-*Montoya* instruction because *Montoya* cannot be retroactively applied. He claims the error compels reversal. We agree.

Both the federal and state Constitutions prohibit ex post facto application of laws. (U.S. Const., art. I, §§ 9, 10; Cal. Const., art. I, § 9; see *People* v. *Davis* (1994) 7 Cal.4th 797, 811 [30 Cal.Rptr.2d 50, 872 P.2d 591].) Although these provisions expressly limit only legislative power, the principle underlying the ex post facto prohibition—that people have a right to fair warning of that conduct which will give rise to criminal penalties—is so fundamental that the prohibition applies equally to judicial decisions. (*People* v. *King* (1993) 5 Cal.4th 59, 79 [19 Cal.Rptr.2d 233, 851 P.2d 27]; *People* v. *Wharton* (1991) 53 Cal.3d 522 [280 Cal.Rptr. 631, 809 P.2d 290]; see *Ross* v. *Oregon* (1913) 227 U.S. 150, 161 [57 L.Ed. 458, 463, 33 S.Ct. 220].) Thus, "[i]f a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect." (*Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 354 [12 L.Ed.2d 894, 900, 84 S.Ct. 1697]; *Rose* v. *Locke* (1975) 423 U.S. 48, 50 [46 L.Ed.2d 185, 188, 96 S.Ct. 243]; *People* v. *King*, *supra*, 5 Cal.4th at p. 80.)

For example, in *In re Baert* (1988) 205 Cal.App.3d 514 [252 Cal.Rptr. 418], the court held that *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], which eliminated intent to kill as an element of the felony-murder special circumstance, could not be applied retroactively because the case law requiring intent had been "unambiguous and consistently applied" and the holding in *Anderson* was an unforeseeable judicial enlargement of a criminal statute. (*In re Baert*, *supra*, 205 Cal.App.3d at pp. 519-520.)

In *People* v. *King*, *supra*, 5 Cal.4th 59, the court overruled *In re Culbreth* (1976) 17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23], which had held that only one firearm use enhancement could be imposed for two murders committed as part of an indivisible transaction. The People argued that the new holding should be retroactive. They noted that the enhancement statute had always authorized multiple enhancements and *Culbreth* had always been a controversial, often criticized, decision. According to the People, these

circumstances provided adequate notice that the court might reconsider the *Culbreth* rule, thus making the holding neither unexpected nor unforeseen. (5 Cal.4th at p. 80.) The court disagreed, observing that such an argument was based on " 'conjectural suppositions, inferences, and conclusions.' The mere possibility that this court might reconsider its own precedent is not the equivalent of actually overruling it." (*Ibid.*)

More recently, in *People v. Davis, supra,* 7 Cal.4th 797, the court held that a finding of fetal viability was not necessary to convict one of murder under section 187, subdivision (a). Citing both *Baert* and *King,* the court further concluded that its holding was not retroactive because it unforeseeably enlarged section 187. The court noted that lower appellate courts had consistently, but erroneously, read a viability requirement into the statute. (7 Cal.4th at pp. 811-812.)

In *People v. Montoya, supra,* 7 Cal.4th 1027, the court did not explicitly decide whether its holding was retroactive. Apparently, it was unnecessary to do so. There, the defendant claimed the trial court had a sua sponte duty to instruct the jury that intent had to be formed before or during entry. (*Id.* at p. 1038.) The court first resolved how long a burglary lasts for purposes of determining the liability of an aider and abettor. Given the record, the court then opined that the time when the defendant formed his intent was not a factual issue in the case and, therefore, the trial court was not required to give any instruction on it. (*Id.* at p. 1048.) Rather, the more basic aiding and abetting instructions were adequate. (*Id.* at pp. 1048-1050.)[3]

Here, whether defendant formed the intent to aid and abet Herrera before or at the time Herrera entered the Somerses' house was "closely and openly" connected to the facts and the court instructed on the issue. Indeed, if the jury believed defendant's testimony, partially corroborated by Herrera, then under the pre-*Montoya* rule, it could not have been convicted him of aiding and abetting a burglary. ■ Thus, we must decide whether *Montoya* may be applied retroactively.

The People posit several reasons why it may. They first suggest it was proper to apply *Montoya* because defendant knew his conduct was unlawful,

---

[3]In disapproving the CALJIC instruction requiring intent before or during entry, the court said it was "an incorrect statement of the law and should not be given in *any* case . . . ." (*People v. Montoya, supra,* 7 Cal.4th at p. 1047.) Taken literally, "any case" includes cases, like this, where the defendant's conduct occurred before the holding in *Montoya* became final. However, we do not read into the *Montoya* court's comment an implicit determination that its holding is retroactive. As *King* and *Davis* illustrate, when the court decides whether a holding is retroactive, it does so expressly after careful analysis. (See also *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 635 [87 Cal.Rptr. 481, 470 P.2d 617]; *People v. Wharton, supra,* 53 Cal.3d at p. 586.)

in that it rendered him liable for aiding and abetting a *theft* and being an *accessory* to burglary. Thus, the People argue that defendant "should have been forewarned by his common social duty that circumspect conduct prohibited him from voluntarily assisting a burglar who is still present at the burglarized house and is still in the course of carrying out his original intent to steal."

Underlying this argument is the view that the bar against retroactivity applies only when a new decision penalizes conduct that was *completely* innocent when committed. In that situation a person would have had no notice that he or she was acting unlawfully. Here, however, defendant knew his conduct was unlawful, albeit under different penal statutes. Thus, according to the People, it does not matter whether he had specific notice of his liability for burglary. We are unpersuaded.

The People acknowledge that the ex post facto bar applies to statutes that *increase* punishment for unlawful acts after they were committed. (*Collins* v. *Youngblood* (1990) 497 U.S. 37, 42 [111 L.Ed.2d 30, 38-39, 110 S.Ct. 2715]; *People* v. *Carrasco* (1988) 202 Cal.App.3d 1078, 1082 [249 Cal.Rptr. 154].) This aspect of the bar applies equally to judicial decisions, whose effect is also to increase punishment for criminal conduct after its commission. (See, e.g., *People* v. *King*, *supra*, 5 Cal.4th 59 [discussed above].) *Montoya* has such an effect.

For instance, under pre-*Montoya* law, defendant's version of events, if believed, rendered him liable for aiding and abetting a theft or being an accessory to burglary. Even if we assume the theft of property would have constituted grand, rather than petty, theft (see §§ 486-488), the maximum potential penalty would have been one year in prison or county jail because no firearm was taken. (§ 489, subds. (a) and (b).) The maximum punishment for being an accessory to burglary is the same. (§ 33) On the other hand, under *Montoya*, the same conduct rendered him liable as a principal for first degree burglary. The penal consequences of this offense are more severe: two, four, or six years in prison. (§ 461.) Moreover, residential burglary is also a serious felony (§ 1192.7, subd. (c)(18)), making a conviction therefor a "strike" under the "three strikes" law (§ 667, subd. (d)(1)) and sharply increasing potential punishment should he commit another felony. (See § 667, subds. (a) & (e).)

The People next claim that together the burglary and aiding and abetting statutes informed defendant that helping Herrera after entry but before departure would render him liable for burglary. We disagree. Whatever notice these statutes might in the abstract provide was negated by the existing case law that unambiguously limited the scope of an aider's liability.

Finally, the People claim that *People* v. *Cooper* (1991) 53 Cal.3d 1158 [282 Cal.Rptr. 450, 811 P.2d 742] made the holding in *Montoya* foreseeable. Again we are unpersuaded.

As noted above, the ex post facto bar is based on a defendant's due process right to notice concerning the consequences of his conduct. Thus, in determining the foreseeability of *Montoya*, we focus not so much on whether it follows logically and reasonably from *Cooper* but rather on whether *Cooper* provided constitutionally adequate notice. We think not.

*Cooper* does not criticize or expressly cast doubt on the continued validity of the pre-*Montoya* rule; nor does *Cooper* unmistakably imply that the rule is inconsistent with its holding and, therefore, that it might be abrogated. Moreover, as we shall explain, the analysis in *Cooper* does not provide reasonable notice of the *Montoya* holding and thus of the potential consequences for helping Herrera after his entry.

*Cooper* holds that for the purpose of determining the liability of an aider and abettor for *robbery*, a robbery continues until all acts constituting the offense, i.e., its elements, have ceased. The court explained that since asportation of the stolen property is an element, robbery continues "as long as the loot is being carried away to a place of temporary safety." (53 Cal.3d at pp. 1164-1170.)

The *Cooper* "elements" analysis does not necessarily lead to the holding in *Montoya*. The actus reus of burglary is "entry." It is not unreasonable to understand this word to specify only the act of going into, of entering, and thus to view entry as accomplished and complete when one is finally inside the premises. Given such an understanding, one could reasonably think that the pre-*Montoya* rule, which views the burglary as complete upon entry and limits aiding and abetting liability accordingly, is consistent with the *Cooper* "elements" analysis.

Indeed, the court in *Cooper* stated, ". . . the rule has developed in the Courts of Appeal that one who forms the intent to aid a burglar after the acts constituting the burglary have ceased cannot be liable as an aider and abettor to the burglary." (53 Cal.3d at p. 1169.) As examples of this rule, the court cited cases that affirmed and applied the pre-*Montoya* rule. In citing these cases without suggesting that their application of this rule to burglary was questionable, the *Cooper* court reasonably indicated that pre-*Montoya* cases correctly analyzed the elements of burglary.

Finally, although *Montoya* relies on *Cooper*, among other cases (*People* v. *Montoya*, *supra*, 7 Cal.4th at pp. 1040-1045), the determinative analytical

focus in *Montoya* is different from that in *Cooper*. In both cases the court decided the duration of an offense for the purpose of determining the liability of an aider and abettor. In *Cooper*, the court applied an "elements" test: when the final element—asportation—had been accomplished, the offense and potential liability as a aider and abettor ceased. In *Montoya*, the court did not rely on the element of entry and when it was accomplished to fix the duration of a burglary. Rather, the court relied on policy: the *purpose* of the burglary statute, namely, to prevent " 'the danger [to personal safety] caused by the unauthorized entry itself.' " (7 Cal.4th at p. 1042.) The court reasoned that liability for burglary continues until the burglar leaves because the danger created upon entry does not terminate after entry has been accomplished but continues as long as the burglar remains inside the premises. (*Id.* at p. 1043.) This different analytical focus further lessened any possible notice *Cooper* might have provided.

We note with interest that even after *Cooper*, the demise, or even questionable validity, of the pre-*Montoya* rule was not obvious to the court in *People* v. *Escobar*, *supra*, 7 Cal.App.4th 1430. There, the court acknowledged *Cooper* but expressly affirmed and applied the pre-*Montoya* rule without even hinting that *Cooper* might have cast doubt on it. That case involved *multiple* entries within a very brief period of time. The court rejected the claim that liability as an aider and abettor required an intent to help before the *initial* entry. Rather, citing *Cooper*, the court held that under such circumstances, one may be liable for burglary if he or she formed the intent to aid and abet *before or during* any one of the multiple entries. (*Id.* at p. 1437; see former CALJIC No. 14.54 (1993 rev.).)

In sum, *Cooper* did not make *Montoya* any more foreseeable than were holdings in *Baert*, *King*, and *Davis* before those cases were decided. Moreover, the pre-*Montoya* rule, like the requirement of fetal viability in *Davis*, had been consistently applied in the appellate cases. Simply put, the holding in *Montoya* was " 'unexpected and indefensible' " (*Bouie* v. *City of Columbia*, *supra*, 378 U.S. at p. 354 [12 L.Ed.2d at p. 900]) by reference to case law applicable at the time of defendant's conduct, and that case law had to be expressly overruled. As the court in *King* observed, however, whether existing judicial precedent will be overruled is a matter of speculation and conjecture. (*People* v. *King*, *supra*, 5 Cal.4th at p. 80.)

■ Where the prosecution presents its case to the jury on alternate theories, one of which is legally correct and the other legally incorrect, and the reviewing court cannot determine from the record on which theory the jury rested its general verdict of guilt, the conviction cannot stand. (*People* v.

*Guiton* (1993) 4 Cal.4th 1116, 1128-1029 [17 Cal.Rptr.2d 365, 847 P.2d 45]; *People* v. *Green* (1980) 27 Cal.3d 1, 69 [164 Cal.Rptr. 1, 609 P.2d 468].) Moreover, where an instruction violates the ex post facto bar, the error is of federal constitutional dimension, reviewable under the *Chapman*[4] harmless-beyond-a-reasonable-doubt standard.

Here, the prosecutor claimed defendant was the direct perpetrator. Alternatively, he claimed defendant aided and abetted Herrera, specifically relying on the *Montoya* instruction to argue that even if the jury believed defendant's testimony, he was still guilty of burglary because he aided Herrera before Herrera departed. Since *Montoya* is not retroactive this latter specific theory was legally erroneous. We cannot now tell on which theory the jury relied. Therefore, defendant's conviction must be reversed. Moreover, given the prosecutor's argument, we are not convinced beyond a reasonable doubt that the erroneous instruction had no effect on the jury's deliberations and verdict.[5]

## IV. *Flight Instruction*

The trial court gave the statutorily prescribed flight instruction: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but it is a fact which, if proved, may be considered by you in light of all the other proved facts in deciding the question of guilt or innocence. The weight to such—the weight to which such circumstances is entitled is a matter for the jury to determine." (See § 1127c.)[6] Defendant contends the trial court erred in failing to modify the instruction.

### A. *Limiting Instruction*

Defendant concedes the instruction applied to the burglary charge. However, he asserts the instruction was not applicable to the escape charge because flight is an element of the offense. Thus, he claims the court had an

---

[4]*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824].

[5]Given our reversal of the burglary conviction, we need not address defendant's claim that the court erred in denying his request for a complete transcript of his first trial on the burglary charge because the effect of any such error would be confined to the burglary conviction.

[6]Section 1127c provides, in relevant part, "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the trial court shall instruct the jury substantially as follows[.]" The section then sets forth the instruction as given by the court. The section further provides, "No further instruction on the subject need be given."

independent duty to tell the jury it could consider evidence of flight only in determining defendant's guilt for the burglary.

■ Although the court must instruct the jury on the general principles of law applicable to a case, this obligation does not extend to instructions limiting the purposes for which particular evidence may be considered. (*People* v. *Duran* (1983) 140 Cal.App.3d 485, 494 [189 Cal.Rptr. 595].) Moreover, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate amplifying, clarifying, or limiting language. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1218 [283 Cal.Rptr. 144, 812 P.2d 163]; see, e.g., *People* v. *Hawkins* (1995) 10 Cal.4th 920, 942 [42 Cal.Rptr.2d 636, 897 P.2d 574] [no sua sponte duty limit jury's consideration of other crimes evidence to specific charge]; *People* v. *Freeman* (1994) 8 Cal.4th 450, 495 [34 Cal.Rptr.2d 558, 882 P.2d 249] [no duty to limit other crimes evidence to issue of impeachment]; *People* v. *Andrews* (1989) 49 Cal.3d 200, 218 [260 Cal.Rptr. 583, 776 P.2d 285] [no duty to modify instruction re: accomplice testimony]; *People* v. *Gutierrez* (1993) 14 Cal.App.4th 1425, 1439 [18 Cal.Rptr.2d 371] [no sua sponte duty to modify flight instruction]; *People* v. *Prysock* (1982) 127 Cal.App.3d 972, 1002-1003 [180 Cal.Rptr. 15] [same].)

Defendant did not request a limiting instruction. Thus, he waived any error.

■ Even on the merits, defendant's claim fails because he cannot establish that the lack of a limiting instruction compels reversal. He argues that the court's instruction was prejudicial because it "told the jury that the mere fact the jury had found one of the elements present could be conclusive of [his] guilt." Thus, it "undermine[d] the presumption of innocence by linking the mere fact of defendant's flight with the establishment of his guilt." We are unpersuaded.

We question whether the jury found the flight instruction applicable to the escape charge even without a limiting instruction. We note that during closing argument, the prosecutor asserted that the escape reflected defendant's attempt to avoid prosecution for the *burglary* and thus was relevant to establish guilt for that offense. Defense counsel asserted that the escape was justified by necessity and, therefore, did not indicate that defendant committed the *burglary*. Moreover, the jury was instructed that not all instructions may be applicable and to disregard those it found inapplicable.

In any event and contrary to defendant's claim, the instruction told the jury that evidence of flight was not enough, by itself, to establish guilt.

However, defendant's flight from Elmwood was sufficient to convict him of escape (see § 4530, subd. (a)) unless he established a defense of duress or necessity. In asserting a necessity defense, defendant, in effect, admitted the elements of escape. Defendant fails to convincingly explain how the instruction was prejudicial to his defense.

Moreover, even if he could, such prejudice would not compel reversal because defendant failed to present sufficient evidence to establish this defense. In particular, defendant's own evidence established that after his escape he remained at large for over seven months and never reported to authorities. However, to establish a necessity defense, defendant had to show that he *immediately* reported to the proper authorities when he attained a position of safety from the immediate threat from which he needed to escape. (*People* v. *Lovercamp* (1974) 43 Cal.App.3d 823, 831 [118 Cal.Rptr. 110]; see CALJIC No. 4.44 (1989 new); 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 238, pp. 273-274.)

### B. *Deletion of Inapplicable Language*

Defendant next claims that because there was no evidence of flight at the time of the burglary, the court should have deleted from the standard instruction the phrase "*immediately* after the commission of a crime." (Italics added.) We agree.

■ The inclusion of irrelevant language in an instruction implicates the trial court's duty to give only correct and pertinent instructions responsive to the evidence. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1025 [264 Cal.Rptr. 386, 782 P.2d 627].) Therefore, defendant may properly raise this claim despite his failure to challenge the instruction below.

In *People* v. *Carrera* (1989) 49 Cal.3d 291 [261 Cal.Rptr. 348, 777 P.2d 121], the defendant escaped from jail. The court explained that the basis for a flight instruction was the defendant's escape from jail after his arrest. The escape tended to show guilt for the crime for which he was incarcerated. However, the court opined that under such circumstances, a trial court should have deleted "any reference in the instruction to flight 'immediately after the commission of a crime' and instructed the jury only as to flight after [the] defendant [is] 'accused of a crime,' . . . ." (*Id.* at p. 314.)

The same reasoning is applicable here. There is no evidence defendant fled "immediately" after committing the burglary and the factual basis for

the flight instruction was his escape from custody after being charged for that offense. Thus, we agree that inclusion of irrelevant language in the flight instruction was error. However, given our previous discussion of prejudice, the error did not lower the prosecution's burden of proof on the escape charge or interfere with defendant's ability to establish his necessity defense. Thus, we consider the irrelevant language harmless. (See *People* v. *Crandell* (1988) 46 Cal.3d 833, 873 [251 Cal.Rptr. 227, 760 P.2d 423].)

## V. *Custody Credit*

Defendant contends the trial court did not award him the correct amount of custody credit.

Defendant was arrested for burglary on April 11, 1992, and released from custody on April 14, 1992. He was rearrested and was in jail from August 13, 1992, to March 3, 1993, when he was transferred to Elmwood. He escaped from Elmwood on March 17, 1993, and was rearrested on March 29, 1994. Thereafter, on August 19, 1994, he was sentenced on the burglary and escape convictions.

The court awarded 216 days plus good time credit in connection with defendant's burglary conviction for the period between August 13, 1992, and the escape on March 17, 1993. The court also awarded 144 days plus good time credit in connection with the escape conviction for the period between his rearrest on March 29, 1994, and sentencing on August 19, 1994.

Thereafter, the Department of Corrections wrote to the trial court and said that the calculation of custody credit might be erroneous because it appeared defendant received credit for 144 days of custody against both the burglary and escape convictions. The department pointed out, however, that credit may be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed.

Thereafter, the court amended the abstract of judgment to eliminate the 144 days plus good time credit previously awarded in connection with the escape.

Defendant concludes that the department mistakenly believed that the 144 days of credit were included in the 216 days previously awarded in connection with the burglary. The People agree. Thus, defendant argues that the trial court erroneously deprived him of any and all credit for the period of custody between his rearrest after the escape and sentencing.

The People concede that defendant "appears to have a point." However, they argue that defendant was, in fact, entitled to only 212 days of credit because the period of custody from August 13, 1992, to January 10, 1993, was attributable to unrelated offenses. Since defendant would have been in custody regardless of the burglary and escape charges, custody was not attributable to those offenses and therefore he was not entitled to custody credit against his sentence for them. (See *People* v. *Bruner* (1995) 9 Cal.4th 1178, 1193-1194 [40 Cal.Rptr.2d 534, 892 P.2d 1277].)

The People also argue that the trial court's calculation of good time/work time credit should be adjusted downward not only because the actual days in custody were fewer but also because defendant's escape "should be deemed to disqualify him from thereafter accumulating presentence credits for good behavior."

According to the People, defendant is entitled to only 248 days of credit and not the 332 days that remained even after the trial court amended the abstract of judgment.

The record before us does not clearly establish the People's claim that defendant received credit for "unrelated" custody to which he was not entitled. The probation report contains the following unexplained entry: "Serv. unrel. CJ sent. 8/24/92-1/10/93[.]" The People assert only that defendant's arrest on August 13, 1992, was pursuant to a warrant "presumably unrelated" to the burglary charge.

Furthermore, neither the probation department nor the trial court deemed it appropriate to reduce the additional work and behavior credit to which defendant was entitled.[7] Thus, the People invite us to act for the trial court and retroactively reduce credit for reasons the trial court implicitly rejected. We decline to do so.

We note that our reversal of the burglary conviction mandates a remand. Both parties claim that the amount of credit must be changed in some way. If the People's claim about the unrelated basis for a period of custody is correct, then both defendant's and the People's arguments for an adjustment of credit appear to have some merit. Under these circumstances, we believe it is appropriate to have the trial court resolve custody credit issues.

---

[7] Of course, under certain circumstances, an escape may result in the Department of Corrections extending a defendant's release date, which may have the effect of denying him or her conduct credit. (See, e.g., *People* v. *Quijada* (1984) 156 Cal.App.3d 789 [202 Cal.Rptr. 846].)

## VI.   *Disposition*

The judgment is reversed, and the matter is remanded for further proceedings.

Premo, Acting P. J., and Elia, J., concurred.