74 Cal.Rptr.2d 7 (1998)
62 Cal.App.4th 244
The PEOPLE, Plaintiff and Respondent,
v.
Kathey Lynn JAMES, Defendant and Appellant.
No. E019765.
Court of Appeal, Fourth District, Division Two.
March 12, 1998.
As Modified March 30, 1998.[**]
Review Denied June 10, 1998.
*9 Stephen Gilbert, under appointment by the Court of Appeal, Monica, for Defendant and Appellant.
Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Senior Assistant Attorney General, Garrett B. Beaumont and Robert M. Foster, Supervising Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

OPINION
RICHLI, Associate Justice.
While defendant Kathey Lynn James (defendant) was manufacturing methamphetamine, *10 one of the volatile chemicals she was using in the process caught fire; a conflagration followed in which her home was destroyed and three of her children killed.
A jury found defendant guilty on three counts of second degree murder (Pen.Code, § 187, subd. (a)), one count of manufacturing methamphetamine (Health & Saf.Code, § 11379.6, subd. (a)), and one count of conspiracy to manufacture methamphetamine (Pen.Code, § 182); the jury expressly based each of the murder verdicts on both implied malice and second degree felony-murder. Defendant was sentenced to 45 years to life in prison.
In the published portion of this opinion, we hold (1) manufacturing methamphetamine is an inherently dangerous felony for purposes of the second degree felony-murder rule, and (2) there is substantial evidence defendant acted with implied malice. In the nonpublished portion, we find no other prejudicial error. Accordingly, we will affirm.

FACTUAL BACKGROUND
In August 1995, defendant rented a mobile home (or trailer) in the Aguanga area of Riverside County. She lived there with her four children: Jimmy, who was seven; Deon, three; Jackson, two; and Megan, one. Two other adults, Richard Jones, and his girlfriend Kristy Barton, also lived in the mobile home. Jones and Barton looked after the children and kept house. Michael Talbert lived elsewhere, but he, too, stayed in the mobile home from time to time. Defendant owned a camper, which was kept next to the mobile home. Harry "Happy" Jensen lived in the camper. In exchange for room and board, he acted as handyman.
Defendant supported the entire household by manufacturing methamphetamine. All the adults were methamphetamine users; none of them had any other source of income. Defendant made a batch of methamphetamine about once a week. Jensen was learning how to "cook"; he helped her during the manufacturing process and cleaned up afterward. Talbert obtained chemicals for her and helped her collect debts.
Jensen and Talbert, and, to a lesser extent, Jones and Barton, all saw defendant manufacturing methamphetamine. She began with "Mini-Thin" tablets, an over-the-counter medicine containing pseudoephedrine. First, she dissolved the tablets in hot water; then she added Coleman fuel,[1] acetone, and/or lye, and "boil[ed] them down" to extract the ephedrine. Next, she "gassed" the solution. That is, she combined salt and sulfuric acid to make hydrochloric gas; when she applied the gas to the solvent, solid pseudoephedrine dropped out. Next, she put the pseudoephedrine into a Pyrex coffee pot, added red phosphorus and iodine, and heated the mixture on a hot plate. She wrapped the coffee pot with tape so that, if it blew up, pieces of Pyrex would not fly around the room. Finally, she cleaned the methamphetamine with acetone. The acetone dissolved the methamphetamine, leaving any impurities behind. Then she removed and evaporated the acetone. This left pure methamphetamine. Sometimes defendant would speed up the evaporation process by putting the acetone in the oven, on the stove top, or in the microwave.
At any given time, defendant had on hand one or two five-gallon drums of acetone, up to 30 to 40 one-gallon cans of Coleman fuel, and up to 20 cans of lye. The acetone was kept in a shed and brought inside, as needed, in a smaller jar or can. The lye was kept both in the kitchen and in the back bathroom. It was also used to clean out clogged drains. Defendant kept red phosphorus in glass jars under her bed. She kept iodine crystals in a plastic jar. She kept muriatic and/or sulfuric acid under the bathroom sink.
Theresa Kloos, who bought methamphetamine from defendant, once saw defendant "cooking" methamphetamine in the kitchen. She also saw her use a microwave to dry some freshly made drugs. Two small children, in diapers, were nearby.
On December 23 and 24, 1995, defendant collected some $1,500 owed to her for drugs. *11 She spent almost all of it on Christmas presents for her children.
On December 26, 1995, at about 3:15 p.m., a fire broke out in the mobile home and burned it to the ground. Defendant escaped through the window of the front bathroom. Her oldest son, Jimmy, also escaped through a window. Deon, Jackson, and Megan died in the fire.
During the fire, defendant was crying and screaming, "The kids are in the house. My babies. My babies." She told a neighbor, "I tried to get them out but got burned."
Defendant sustained burns to her face, her right hand, the front of both calves, and the back of her right thigh. The burns to her calves stopped at a line at the level of her bike pants. Similarly, the burns to her hands stopped at a line on her wrist.
Kevin Carr, a volunteer firefighter who responded to the fire, noticed green or yellow-green smoke, and blue or green flames. Several patches of bare dirt outside the mobile home were on fire; these, too, produced some green flames. These were all indications that a possibly toxic chemical was burning. The fire also generated an unusually large amount of smoke.
After the fire, Barton and Jones took Jimmy to the home of a neighbor, Kim Hartigan. Jimmy told Hartigan "his mother was cooking white stuff on the stove.... [W]hile she was pouring the white stuff in the pan, ... it caught on fire." Police officers came to Hartigan's house and asked Jimmy what had happened. Jimmy said his mother put a pan on the stove and poured some "white stuff into it. An officer asked, "What white stuff?" Jimmy answered, "The stuff you put in the toilet."
The day after the fire, the police interviewed Jimmy again. At first (as he admitted at trial), he did not tell the whole truth; but then he said, "Okay. I'm going to tell you the truth." He said when the fire started, he was in the living room. His mother was in the kitchen, cooking "white medicine" on the stove. Jensen "may have been in the kitchen helping." Defendant had been cooking and selling the white medicine for a long time. She kept the chemicals in her bedroom and in the kitchen cupboard. The other children were in the kitchen, on the floor. Defendant "turned the fire way up." "[I]t went down on the floor and burned everything up."
At trial, Jimmy testified that when the fire started, he was in the living room. The three younger children were in the kitchen. Jensen was resting on a couch in the living room. At first, Jimmy testified defendant was in the bathroom. However, after listening to a tape of his previous statements to police, he testified she was in the kitchen, cooking something at the stove. He described it as drain cleaner and as "white medicine." "She cooks it and she sells it." Jensen was also cooking.
Jimmy testified the fire started in the kitchen, near the stove. He admitted telling police defendant turned up the stove; at trial, however, he testified, "I think my brother or my sister turned it up." The fire "burned up to the wall, and then it came on the floor." Defendant threw water on the fire. Jimmy saw Talbert running. He did not see Jensen.
When shown a can of lye, Jimmy identified it as something his mother used in cooking white medicine: "She puts [it], on the stove, into something else." She kept her chemicals in the bedroom or in a kitchen cupboard.
Harry Jensen testified[2] he was in his camper when he heard a "whoosh." He saw defendant running away from the kitchen; there were flames behind her. He ran into the mobile home. It began to fill up with smoke. In trying to find a window, Jensen stepped on the couch and on Talbert, who was sleeping there. This woke Talbert up. Talbert managed to crawl out the front door. Jensen became disoriented, but he, too, got out the front door. He sustained severe burns to his face, including his larynx and eardrums, his arms, and his hands.[3]
*12 Michael Talbert testified[4] that, in the morning, he used some methamphetamine. Later, he had a toothache; he took some codeine pills and went to sleep on a couch in the living room. Before going to sleep, he saw defendant holding a plastic bucket of Mini-Thins. Just after he woke up, he saw defendant pouring something from a Coleman fuel can into a pan on the stove. Whatever was in the pan boiled over and caught fire. Talbert went to get a blanket, then saw it would do no good. He did not see any children. He opened the back door; this caused a blast of flame, which blew him out the door. He had not seen Jensen come in, but Jensen was right behind him and caught the worst of the blast. Defendant and Jimmy were already outside. Talbert's hands and the back of his head were burned.
According to Talbert, defendant kept a hot plate on the kitchen counter. After the fire, the police found two hot plates in the kitchen counter area. It was impossible to tell if their switches had been on or off at the time of the fire.
When the police interviewed Talbert, he told them he was asleep on the couch until the heat of the fire woke him up. He told a defense investigator and a Department of Forestry investigator the same thing. The first time he claimed to have woken up before the fire was four months later, when the prosecutor told him he was facing ten years in prison.
Richard Jones testified he and Barton were dozing in the bedroom with the door closed. He was awakened by a loud noise. When he opened the bedroom door, he saw flames on the floor coming toward him. At that moment, defendant opened the door of the front bathroom and said, "Oh, my God." Jones shut the bedroom door, and he and Barton climbed out a window. When he saw defendant outside, she did not appear burned.
After the fire, Jimmy told Jones he saw "Happy [Jensen] cooking something on the stove. Then he said his mom. Then he said Happy." He said his mother "put a bunch of medicine into a pan and put in some liquid."
Kristy Barton testified that between 11 a.m. and 1 p.m. she went to the bedroom and lay down with Jones. She was awoken by Jones asking "what [that] noise was." Jones opened the bedroom door. Barton saw flames; she heard defendant, in the bathroom, say, "Oh, my God." Jones shut the door again. Barton and Jones climbed out a window. When Barton saw defendant outside, defendant was wearing a bra and bike pants, and she was all wet.
After the fire, Jimmy told Barton he had been getting dressed when he saw an orange flash from the kitchen. Barton asked who was in the kitchen. Jimmy said, "Harry."
When Jensen and defendant were in the hospital together, she told him "the fumes... went up and caught fire."
When the police interviewed defendant in the hospital, she said that when the fire started, she was in the kitchen, with her back to the stove. She denied ever manufacturing methamphetamine.
About six months after the fire, defendant and Theresa Kloos were in custody together. Defendant said, "Don't you know me?" "It was my lab that blew up that killed my three children...." Later, she told Kloos, "I don't remember well since the fire.... I've never cooked dope." She told Kloos Christmas tree lights started the fire.
Captain Howard Windsor, a fire investigator with the Department of Forestry, testified the fire started in the kitchen. Based on the physical evidence alone, there was no way to determine the precise point of origin. However, extensive damage to the top of the stove was consistent with witnesses' statements that the fire started there. He concluded the fire started when defendant was extracting ephedrine in the course of manufacturing methamphetamine. Defendant *13 poured either acetone or Coleman fuel into a pan on the stove. Vapors from the liquid, which were heavier than air, overflowed the pan and traveled downward. When they met the burner or some other heat source, they ignited; the flame spread back up the vapor trail to the container. This was consistent with the fact that defendant's face was singed and her right hand Was burned, but her left hand was not. A vapor fire would have caused the "whoosh" sound Jensen reported hearing. Several acetone or Coleman fuel containers had exploded, indicating their contents had contributed to the intensity and rapid spread of the fire. Throwing water on the fire would only have made it worse.
Windsor characterized Talbert and Jensen's burns as "topside burn injuries," to the top of the head, the ears, and the back of the neck. This was consistent with their testimony that Talbert, followed by Jensen, opened a door and left.
Thomas Fee, a private arson investigator, agreed the fire started in the kitchen. He testified the damage to the top of the stove indicated the presence of a flammable liquid there. The burns to defendant's legs had also been caused by a flammable liquid. Fee thought the fire probably started when defendant was pouring a flammable liquid into a pan, either on top of the stove or on a hot plate nearby; flammable vapor overflowed the pan and ignited when it reached the stove's pilot light.
David Lowe, a private fire investigator who testified for the defense, testified it was impossible to determine the cause of the fire. While it could have been caused by drug manufacturing, it also could have been caused by leaking propane. He agreed it probably began in the kitchen. He could not rule out the possibility Captain Windsor's theory was correct. However, he did not believe defendant would have been so foolish as to pour acetone or Coleman fuel over an open flame. Also, if the fire had started that way, defendant would have had more burns to her face and torso. Lowe testified that, except for the burn on the back of defendant's thigh, her burns were inconsistent with burning liquid fuel.
Jensen and Jones both testified defendant had a gasoline-powered generator. After the fire, a generator was found in the wreckage of the mobile home, between the kitchen and the living room. The fuel cap was missing.
Defendant testified she had made some 300 batches of methamphetamine over a ten-year period and had never had an explosion or a fire. She "cooked" in the back bathroom, with the door locked, or in the camper; she never "cooked" in the kitchen,[5] or in the presence of her children. She admitted using Coleman fuel in the manufacturing process, but she denied using acetone, except for using a small quantity of it to purify the methamphetamine she made for her personal use. Aside from her red phosphorous and her iodine crystals, which she buried off her property, she kept her chemicals and equipment in a locked cabinet in the back bathroom.
Defendant claimed she manufactured methamphetamine "in the safest way as possible." She manufactured "[o]ne step at a time, which made it a lot more safe and clean." She tried to avoid adding any heat to the process, although, when she needed to, she used a lukewarm heating plate. She had hired Barton and Jones to take care of her children so they would not be around when she was "cooking."
Defendant testified that on December 26, 1995, Jimmy woke her up and told her the electricity was off. She took the cap off the generator; she poured some Coleman fuel into a plastic bucket, getting it ready to pour into the generator.[6] However, before she had actually poured the Coleman fuel into the generator, the electricity came back on.
Talbert was asleep on the couch. Defendant put the three younger children down for a nap in the living room. She was undressing to take a bath when she heard Jimmy scream for her. She saw flames in the kitchen. She spotted the plastic bucket of Coleman *14 fuel; just as she picked it up, it caught fire. She ran toward the bathroom with it, but the bucket melted and the burning fuel splattered onto her legs and onto the floor. She jumped into the bathtub to put out the fire. When she opened the bathroom door, Jones was just closing the bedroom door. "The fire was everywhere." She closed the bathroom door and dove out the window. She was wearing only a bra and bike pants. When she was admitted to the hospital, however, she was wearing a top. She thought she got it from her truck after the fire.
When defendant saw Jensen, his face was black. Jones agreed Jensen's face was singed and sooty. Fee testified this indicated proximity to a flash fire.
Defendant did not remember talking to either Jensen or the police at the hospital. When she was in the hospital, she had hallucinations. She denied ever talking to Theresa Kloos, whom she knew to be a "professional snitch."
Defendant was arrested when she tried to check out of the hospital against her doctors' advice. She falsely claimed her sister was coming to pick her up.
Jensen agreed the electricity was off some time before the fire. Jimmy, however, did not remember this.
Thomas Fee testified it would be impossible to hold onto a bucket of burning Coleman fuel for more than a split second. Also, the top edges of the bucket would melt before the bottom would. Fee added that the burn line on defendant's wrist indicated that, when she was burned, she was wearing a long-sleeved top like the one she had on when she was admitted to the hospital.

I

THE FELONY OF MANUFACTURING METHAMPHETAMINE IS INHERENTLY DANGEROUS TO HUMAN LIFE
Defendant contends manufacturing methamphetamine (Health & Saf.Code, § 11379.6) cannot be used to support a murder conviction under the second degree felony-murder rule, because it is not an inherently dangerous felony.

A. The Second Degree Felony-Murder Rule.

Murder is defined as the "unlawful killing of a human being ... with malice aforethought." (Pen.Code, § 187, subd. (a).) Malice "may be express or implied." (Pen. Code, § 188.) Express malice murder requires an intent to kill. (Id.; People v. Saille (1991) 54 Cal.3d 1103, 1114, 2 Cal.Rptr.2d 364, 820 P.2d 588.) "Implied malice murder... requires instead an intent to do some act, the natural consequences of which are dangerous to human life. When the killing is the direct result of such an act,' the requisite mental state for murdermalice aforethought is implied. [Citation.] In such circumstances, `... it is not necessary to establish that the defendant intended that his act would result in the death of a human being.' [Citation.]" (People v. Swain (1996) 12 Cal.4th 593, 602-603, 49 Cal.Rptr.2d 390, 909 P.2d 994, quoting CALJIC No. 8.31, italics omitted.)
Murder also may be committed, even in the absence of actual malice, under the felony-murder rule; "The felony-murder rule `artificially imposes malice as to one crime because of defendant's commission of another' and thereby satisfies the standard of culpability necessary to raise a homicide to murder. [Citation.]" (People v. Wells (1996) 12 Cal.4th 979, 989, 50 Cal.Rptr.2d 699, 911 P.2d 1374, quoting People v. Phillips (1966) 64 Cal.2d 574, 583, fn. 6, 51 Cal.Rptr. 225, 414 P.2d 353.) "The felony-murder rule applies to both first and second degree murder." (People v. Hansen (1994) 9 Cal.4th 300, 308, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) Under the first degree felony-murder rule, a homicide is first degree murder if it is committed in the perpetration or attempted perpetration of statutorily specified felonies (including arson, robbery and rape). Under the second degree felony-murder rule, a homicide is second degree murder if it is committed in the perpetration or attempted perpetration of any felony that is inherently dangerous to human life. (Ibid.)
*15 "[T]he justification for the imputation of implied malice under these circumstances is that, `when society has declared certain inherently dangerous conduct to be felonious, a defendant should not be allowed to excuse himself by saying he was unaware of the danger to life....' [Citation.] ... [A]lso..., `"[i]f the felony is not inherently dangerous, it is highly improbable that the potential felon will be deterred; he will not anticipate that any injury or death might arise solely from the fact that he will commit the felony.'" [Citation.] Thus, under the latter circumstances the commission of the felony could not serve logically as the basis for imputation of malice. [Citation.]" (People v. Hansen, supra, 9 Cal.4th at p. 308, 36 Cal.Rptr.2d 609, 885 P.2d 1022, quoting People v. Patterson (1989) 49 Cal.3d 615, 626, 262 Cal.Rptr. 195, 778 P.2d 549 and People v. Burroughs (1984) 35 Cal.3d 824, 829, 201 Cal.Rptr. 319, 678 P.2d 894, respectively.)
"In determining whether a felony is inherently dangerous, the court looks to the elements of the felony in the abstract, `not the "particular" facts of the case,' i.e., not to the defendant's specific conduct. [Citation.]" (People v. Hansen, supra, 9 Cal.4th at p. 309, 36 Cal.Rptr.2d 609, 885 P.2d 1022, quoting People v. Williams (1965) 63 Cal.2d 452, 458, fn. 5, 47 Cal.Rptr. 7, 406 P.2d 647; accord People v. Patterson, supra, 49 Cal.3d at pp. 620-621, 262 Cal.Rptr. 195, 778 P.2d 549; People v. Burroughs, supra, 35 Cal.3d at p. 830, 201 Cal.Rptr. 319, 678 P.2d 894.) `"This form of [viewed-in-the-abstract] analysis is compelled because there is a killing in every case where the rule might potentially be applied. If in such circumstances a court were to examine the particular facts of the case prior to establishing whether the underlying felony is inherently dangerous, the court might well be led to conclude the rule applicable despite any unfairness which might redound to the defendant by so broad an application: the existence of the dead victim might appear to lead inexorably to the conclusion that the underlying felony is exceptionally hazardous.'" (People v. Patterson, supra, 49 Cal.3d at p. 622, 262 Cal.Rptr. 195, 778 P.2d 549, brackets in original, quoting People v. Burroughs, supra, 35 Cal.3d at p. 830, 201 Cal.Rptr. 319, 678 P.2d 894.)
For many years, the California Supreme Court found it unnecessary to define "inherently dangerous felony." In People v. Burroughs, supra, 35 Cal.3d 824, 201 Cal. Rptr. 319, 678 P.2d 894, however, it referred to an inherently dangerous felony as one which "by its very nature, ... cannot be committed without creating a substantial risk that someone will be killed...." (Id., at p. 833, 201 Cal.Rptr. 319, 678 P.2d 894.) Later, in People v. Patterson, supra, 49 Cal.3d 615, 262 Cal.Rptr. 195, 778 P.2d 549, it defined an inherently dangerous felony as "an offense carrying `a high probability" that death will result." (Id., at p. 627, 262 Cal.Rptr. 195, 778 P.2d 549 [lead opn. of Kennard, J.]; see also id., at p. 640, 262 Cal.Rptr. 195, 778 P.2d 549 [cone, and dis. opn. of Mosk, J., joined by Broussard, J.], at p. 641, 262 Cal.Rptr. 195, 778 P.2d 549 [cone, and dis. opn. of Panelli, J.].) Most recently, the court reaffirmed both of these definitions, treating them as if they were equivalent and interchangeable. (People v. Hansen, supra, 9 Cal.4th at p. 309, 36 Cal.Rptr.2d 609, 885 P.2d 1022.)

B. The Propriety of Considering Evidence.

Whether a felony is inherently dangerous for purposes of the second degree felony-murder rule is a question of law, or, at a minimum, a mixed question of law and fact, which we review de novo. (People v. Taylor (1992) 6 Cal.App.4th 1084, 1090-1094, 8 Cal. Rptr.2d 439.) In applying this standard of review, however, we face a difficult threshold question: what evidenceif anymay we look to?
In every relevant California case we have foundwith two significant exceptions, which we will discuss in due coursethe reviewing court decided whether the felony at issue was inherently dangerous without considering any evidence at all. This is consistent with the requirement that the court must view the elements of the felony in the abstract.
For example, in People v. Hansen, supra, 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022, the court held the felony of discharging a firearm at an inhabited dwelling (Pen.Code, *16 § 246) is inherently dangerous. It reasoned: "An inhabited dwelling house is one in which persons reside [citation] and where occupants `are generally in or around the premises.' [Citation.] In firing a gun at such a structure, there always will exist a significant likelihood that an occupant may be present. Although it is true that a defendant may be guilty of this felony even if, at the time of the shooting, the residents of the inhabited dwelling happen to be absent [citation], the offense nonetheless is one that, viewed in the abstractas shooting at a structure that currently is used for dwelling purposesposes a great risk or `high probability' of death...." (Id., at p. 310, 36 Cal.Rptr.2d 609, 885 P.2d 1022, quoting People v. White (1992) 4 Cal. App.4th 1299, 1303, 6 Cal.Rptr.2d 259.)
By similar reasoning, in People v. Henderson (1977) 19 Cal.3d 86, 137 Cal.Rptr. 1, 560 P.2d 1180, the court held the felony of false imprisonment (Pen.Code, §§ 236, 237) is not inherently dangerous. It explained:
"First, ... the primary element of the offense, namely the unlawful restraint of another's liberty, does not necessarily involve the requisite danger to human life. The aspect of confinement is not life threatening.... The unlawful conduct by which the confinement is accomplished also does not necessarily involve a hazard to the victim's life." (Id., at pp. 93-94, 137 Cal.Rptr. 1, 560 P.2d 1180.) "Second, ... the four factors of violence, menace, fraud, or deceit do not all involve conduct which is life endangering. Quite obviously fraud or deceit portend no such danger.... While the elements of violence or menace ... may involve danger to human life, the felony offense viewed as a whole in the abstract is not inherently dangerous to human life." (Id., at p. 94, 137 Cal.Rptr. 1, 560 P.2d 1180.)
The first case which suggested a court may consider evidence on this question was People v. Patterson, supra, 49 Cal.3d 615, 262 Cal.Rptr. 195, 778 P.2d 549. There, the trial court initially dismissed a murder charge against the defendant, on the ground that the underlying felony of furnishing cocaine (Health & Saf.Code, § 11352) was not inherently dangerous. (Id., at p. 619, 262 Cal. Rptr. 195, 778 P.2d 549.) The People appealed, but the Court of Appeal affirmed; it held that, because the underlying felony could be committed not only by furnishing a controlled substance, but also by transporting or offering to transport a controlled substance, it was not inherently dangerous. (Id., at pp. 619-620, 262 Cal.Rptr. 195, 778 P.2d 549.) The Supreme Court reversed. It held: "In determining Whether defendant had committed an inherently dangerous felony, the court should have considered only the particular crime at issue, namely, furnishing cocaine, and not the entire group of offenses included in the statute but not involved here." (People v. Patterson, supra, 49 Cal.3d at p. 620, 262 Cal.Rptr. 195, 778 P.2d 549; see also id, at pp. 622-625, 262 Cal.Rptr. 195, 778 P.2d 549.)
The Supreme Court then went on to state: "Defendant ... argues that even the more narrow offense of furnishing cocaine is not an inherently dangerous felony and therefore the trial court acted correctly in dismissing the murder charge, despite its faulty analysis. In countering that argument, the People have asked us to take judicial notice of various medical articles and reports that assertedly demonstrate that the offense of furnishing cocaine is sufficiently dangerous to life to constitute an inherently dangerous felony, [¶] The task of evaluating the evidence on this issue is most appropriately entrusted to the trial court, subject, of course, to appellate review. We therefore direct the Court of Appeal to remand the matter to the trial court for further proceedings in light of this opinion." (Id., at p. 625, 262 Cal.Rptr. 195, 778 P.2d 549, italics added.)[7]
The second case was People v. Taylor, supra, 6 Cal.App.4th 1084, 8 Cal.Rptr.2d 439. There, the defendant furnished phencyclidine (PCP) to the victim, who drowned while under its influence. (Id., at pp. 1087-1088, 8 *17 Cal.Rptr.2d 439.) The defendant was charged with furnishing PCP (Health & Saf. Code, § 11379.5), and with murder. (Id., at p. 1088, 8 Cal.Rptr.2d 439.) At trial, both sides presented expert testimony with respect to whether furnishing PCP is inherently dangerous. (Id., at pp. 1088-1089, 8 Cal. Rptr.2d 439.) The trial court ruled that furnishing PCP was an inherently dangerous felony. The jury found the defendant guilty of murder on that theory. In an earlier appeal, the appellate court reversed and remanded for reconsideration of whether furnishing PCP was an inherently dangerous felony. The trial court ruled again that it was, and reimposed the judgment. (Id., at pp. 1087, 1089-1090, 8 Cal.Rptr.2d 439.)
The appellate court began by holding the issue was subject to de novo review. It analogized it to an issue of statutory interpretation. (People v. Taylor, supra, 6 Cal. App.4th at pp. 1090-1094, 8 Cal.Rptr.2d 439.) The court then added: "One might wonder why, if the issue is a question of law to be independently reviewed, the Supreme Court in People v. Patterson, supra, 49 Cal.3d 615, 262 Cal.Rptr. 195, 778 P.2d 549 ordered the matter remanded to the trial court, and why we did the same here. The answer is that the determination of a `high probability of death' depends, at least somewhat, on evidence as to the dangerousness of the underlying felony in the abstract, evidence which is best garnered from testimony by experts. Appellate courts have often used evidence gathered by trial courts and referees as the basis for de novo legal rulings. [Citations.]" (Id., at p. 1094, 8 Cal.Rptr.2d 439.) Ultimately, the court held, based on "the record provided" (id, at p. 1095, 8 Cal.Rptr.2d 439), that furnishing PCP is not inherently dangerous. (Id., at pp. 1095-1101, 8 Cal.Rptr.2d 439.)
Patterson and Taylor thus permit a court to consider evidence of whether a felony is inherently dangerous. This is a practical necessity when the danger claimed to be inherent in the elements of a felony is a matter of scientific, medical or technological expertise, rather than common knowledge. The status of a felony may even change over time, as the state of the art changes.
Taylor viewed the question of whether a felony is inherently dangerous as analogous to a question of statutory interpretation. (People v. Taylor, supra, 6 Cal.App.4th 1084, 1090-1092, 8 Cal.Rptr.2d 439.) In statutory interpretation, extrinsic sources, if relevant at all, typically will be judicially noticeable. However, even if the extrinsic sources are in conflict, the question remains one of law for the trial court, and a de novo standard of review applies on appeal. (See Robinson v. Fair Employment & Housing Com. (1992) 2 Cal.4th 226, 235, fn. 6, 5 Cal.Rptr.2d 782, 825 P.2d 767 [even though administrative agency interpretations are relevant, statutory interpretation is a question of law which the court must ultimately resolve.].)
Under the circumstances here, we believe the question is even more analogous to the question of whether a new scientific technique is generally accepted within the relevant scientific community so as to be admissible under the Kelly/Frye rule.[8] (See generally People v. Leahy (1994) 8 Cal.4th 587, 593-612, 34 Cal.Rptr.2d 663, 882 P.2d 321.) In the trial court, "general acceptance" may be shown through expert testimony; but "[t]he court may also consider decisions from other jurisdictions and relevant scientific literature in deciding whether a technique is generally accepted. [Citations.]" (People v. Axell (1991) 235 Cal. App.3d 836, 854, 1 Cal.Rptr.2d 411; accord, People v. Smith (1989) 215 Cal.App.3d 19, 25, 263 Cal.Rptr. 678.)
On appeal, "`general acceptance' is best described as a mixed question of law and fact subject to limited de novo review." (People v. Reilly (1987) 196 Cal.App.3d 1127, 1134, 242 Cal.Rptr. 496; accord People v. Ashmus (1991) 54 Cal.3d 932, 971, 2 Cal.Rptr.2d 112, 820 P.2d 214, cert. den. (1992) 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79.) "Thus, we review the trial court's determination with deference to any and all supportable findings of `historical' fact or credibility, and then *18 decide as a matter of law, based on those assumptions, whether there has been general acceptance. [Citations.]" (People v. Reilly, supra, 196 Cal.App.3d at p. 1135, 242 Cal. Rptr. 496.)
"[O]nce a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." (People v. Kelly, supra, 17 Cal.3d at p. 32, 130 Cal.Rptr. 144, 549 P.2d 1240.) "Thus, case-by-case adjudication ... is not required once the scientific technique in question has been endorsed in a published appellate opinion. [Citation.]" (People v. Morganti (1996) 43 Cal.App.4th 643, 658, 50 Cal.Rptr.2d 837.)
The principles seem apropos here. The trial court still must determine whether a felony is inherently dangerous based on the elements of the felony in the abstract. However, it may, in its discretion, hear proffered evidence that is relevant to that determination. Such evidence ordinarily will consist of expert testimony and scientific or technical literature. The trial court must be careful not to transgress the prohibition against considering the defendant's specific conductor, most of all, the fact that that specific conduct happened to cause death.
On appeal, we review the trial court's determination independently. Once a published appellate opinion holds a felony is (or is not) inherently dangerous, that precedent is controlling, unless and until a litigant makes an offer of proof that technological changes have changed the status of the felony. This ensures that the classification of felonies as inherently dangerous is governed by a uniform rule of law. (See People v. Taylor, supra, 6 Cal.App.4th at p. 1092, 8 Cal.Rptr.2d 439.)

C. The Evidence to Be Considered[***]

D. The Evidence Presented Below.

Although there are several methods of manufacturing methamphetamine, by far the most common one in recent years uses ephedrine. In this method, the first step is to extract ephedrine (or pseudoephedrine) from a medication. The solvents used for this purpose include distilled water, denatured alcohol, Coleman fuel, and acetone. A heat source may be applied to make the medication dissolve faster and/or to make the solvent evaporate faster. As both acetone and Coleman fuel are extremely flammable, this can cause a flash fire.
The second step is to mix the ephedrine with red phosphorus and hydriodic acid, and apply heat for 6 to 72 hours. Because it is illegal to possess hydriodic acid (see Health & Saf.Code, § 11383, subds. (c)(1)(A), (c)(2)), some "cookers" substitute iodine, or iodine and muriatic acid.
The third step is to change the product from an acid to a base, usually by adding lye. This produces a great deal of heat; if the reaction is not cooled down with ice, the product may "splatter." The fourth step is to extract the methamphetamine with a solvent such as Coleman fuel, trichloroethylene or Freon. The fifth step is "gassing." Hydrochloric or sulfuric acid is applied to rock salt or common table salt. The resulting gas, when applied to the solution, makes the methamphetamine crystallize. In an optional final step, the methamphetamine may be washed with acetone to make it whiter.
Acetone and its vapors are extremely flammable. Coleman fuel also is extremely flammable. Iodine crystals are poisonous in contact with the skin, as well when swallowed. If red phosphorus comes into contact with a flame, it will explode. If overheated, it creates poisonous gases. The various acids used in manufacturing methamphetamine can burn the skin. Fumes from some of the chemicals can cause lung damage.
Although most of the evidence dealt with the ephedrine method of manufacturing methamphetamine, there was evidence the "P2P" (phenyl-2-propanone) method is equally dangerous, if not more so; it uses ether, which, like Coleman fuel and acetone, is volatile and highly flammable. There is *19 also something called the "Nazi" method, which is even more dangerous.
Gloria Pingrey, a Special Agent of the California Department of Justice, testified that of the fifty methamphetamine labs she had investigated, four came to her attention as a result of fires. All these fires had occurred during the ephedrine extraction step. In this case and in one other case, the fire had resulted in death. She had also investigated one case, and knew of another case, in which inhaling toxic fumes had caused death. Agents responding to a suspected clandestine methamphetamine lab commonly don plastic suits with chemically repellent gloves and boots and respirators to protect them from hazardous materials.
Ken Riding, also a Special Agent of the California Department of Justice, testified an experienced methamphetamine "cooker," who knows what he or she is doing, can make methamphetamine using ephedrine "in a relatively safe way." However, he agreed it is dangerous to use acetone and Coleman fuel, because they can be ignited by a hot plate or an open flame. He knew of "several" deaths from methamphetamine lab explosions.
Larry Joiner, a criminalist with the California Department of Justice, testified manufacturing methamphetamine is "very hazardous." "One must be very skilled ... to prevent a major accident occurring at the scene." He admitted methamphetamine can be manufactured "relatively" safely, "if the person is very skilled." Some "cookers" have produced thousands of batches without an explosion.
Defense fire investigator David Lowe had investigated one methamphetamine lab fire. In that case, the source of ignition was a water heater pilot light.
The Riverside/San Bernardino/San Diego area is "the meth lab capital of the world." In 1995, the state Bureau of Narcotics Enforcement shut down 364 methamphetamine labs in Riverside and San Bernardino Counties. It estimates that, for each clandestine lab found, two go undetected. The federal Drug Enforcement Agency estimates that, for each lab found, five go undetected.

E. Analysis.

Manufacturing methamphetamine demands the use of hazardous materials. Acetone, Coleman fuel and ether, in particular, are highly volatile and extremely flammable. Their vapors can be ignited by almost any ignition source, including a hot plate or a pilot light. The very process of "cooking" methamphetamine demands the presence of some heat source; and pilot lights are ubiquitous, not only in homes, but also in businesses and motel rooms  though their presence is all too easy to forget. The red phosphorus, iodine, and various acids involved also are extremely hazardous.
The dangers inherent in "cooking" methamphetamine have been recognized in other types of cases. In People v. Odom (1991) 226 Cal.App.3d 1028, 277 Cal.Rptr. 265, the defendant was convicted on charges including possession of methamphetamine precursors with intent to manufacture methamphetamine and felony child endangerment (Pen. Code, § 273a, subd. (a)). (Id., at p. 1030, 277 Cal.Rptr. 265.) The Court of Appeal held there was sufficient evidence to support the child endangerment conviction. It stated:
"[A]ll evidence indicated the home was either being used as a clandestine manufacturing plant or appellant stored the items necessary to manufacture methamphetamine but production occurred at another location.... As expert testimony indicated, if the actual manufacturing was occurring in the home, at every step in the production volatile and dangerous solvent vapors would be produced. Throughout the manufacturing process, acid gases would be generated and sometime [sic] a byproduct called phosphine gas produced. This toxic and flammable gas has such profound effects that in World War I it was utilized as a nerve gas. Later, the phosphorous itself can become overheated, change form, and become an incendiary product. Because the manufacturing process is so highly dangerous, explosions are not unusual.
"Further, even if the home was not a clandestine methamphetamine manufacturing plant, the storing of the numerous chemicals at appellant's home posed inherent dangers. The hydriodic acid was stored without special precautions being taken even though this *20 chemical is so dangerous the hazardous waste laws require a special permit for it to be moved. This corrosive mineral acid, in a liquid state, has a tendency to rapidly release noxious acid gases which can immediately cause second or third degree burns to the skin, and extreme pain and even death if inhaled.... The sulfuric acid is a strong corrosive mineral acid. The inherent nature of the hydrogen chloride, hydrochloric acid and hydriodic acid, all mineral acids, require proper storage to be in acid vaults or at the very least, in a temperature-controlled environment. The hydrogen chloride gas can cause blindness or death if mishandled." (People v. Odom, supra, 226 Cal.App.3d at p. 1034, 277 Cal.Rptr. 265.)
Admittedly, the court relied in part on the fact that some of the chemicals were improperly stored (People v. Odom, supra, 226 Cal. App.3d at p. 1034, 277 Cal.Rptr. 265) and that exposed wiring in the home provided a potential ignition source. (Id., at pp. 1034-1035, 277 Cal.Rptr. 265.) It also relied on other unsanitary and unsafe conditions in the defendant's home. (Id. at p. 1033, 277 Cal. Rptr. 265.) Nevertheless, its opinion strongly suggests the very process of manufacturing methamphetamine is inherently dangerous.
A number of cases have addressed the dangers of manufacturing methamphetamine in the context of the exigent circumstances exception to the Fourth Amendment warrant requirement. For example, in People v. Messina (1985) 165 Cal.App.3d 937, 940, 212 Cal.Rptr. 75, an informant said the defendant was involved in manufacturing methamphetamine. A police officer then found a strong smell of phenyl-2-propanone coming from the defendant's house. He concluded "`there was a clandestine lab in operation and there was an immediate danger.'" Accordingly, without first obtaining a search warrant, police officers and firefighters entered the defendant's home. (Id., at pp. 940-941,212 Cal.Rptr. 75.)
The appellate court held "the warrantless entry into the premises was justified by the existence of exigent circumstances." (People v. Messina, supra, 165 Cal.App.3d at p. 945, 212 Cal.Rptr. 75.) It explained: "[I]t is abundantly clear that the types of chemicals used to manufacture methamphetamines are extremely hazardous to health. The Drug Enforcement Administration's Clandestine Laboratory Guide indicates at pages 110-115 that the common chemicals used to synthesize methamphetamine include methylamine, mecuric chloride [sic], and in some circumstances, metallic sodium, hydrochloric acid, and hydrogen. These chemicals can be highly dangerous and their presence in a residential neighborhood is absolutely beyond the pale of suggestion that they are safe." (Id., at p. 943, 212 Cal.Rptr. 75.) It noted that the process involved "`[v]ery flammable gases, very volatile flammable liquids, and materials that in the form of dusts or mists readily form explosive mixtures when dispersed in air.'" (Id., at p. 944, 212 Cal.Rptr. 75.) It concluded: "Beyond a shadow of doubt, the presence of these chemicals in an unprofessional laboratory in a residential area constitutes an emergency which requires immediate and proper response by law enforcement." (People v. Messina, supra, 165 Cal.App.3d at p. 944, 212 Cal.Rptr. 75.)
In People v. Duncan (1986) 42 Cal.3d 91, 227 Cal.Rptr. 654, 720 P.2d 2, a police officer entered the defendant's home to investigate an apparent burglary in progress. He discovered bags of white powder, assorted chemical equipment, and a strong smell of ether. (Id., at pp. 95-96, 227 Cal.Rptr. 654, 720 P.2d 2.) His supervisor concluded it housed an illegal drug lab. (Id., at p. 96, 227 Cal.Rptr. 654, 720 P.2d 2.) They called in Officer Gremminger, who called the fire department, then entered the home, and ordered the gas and electricity turned off and the building ventilated. (Id., at pp. 96-97, 227 Cal.Rptr. 654, 720 P.2d 2.)
On behalf of the People, it was argued "that Gremminger's warrantless entry was justified by the exigent circumstances created by the presence of a drug laboratory and the strong smell of ether, i.e., the volatile nature of the chemicals involved in the manufacture of drugs such as PCP and methamphetamine and the inexpert manner in which such chemicals are handled by residential producers of such drugs creates a serious *21 danger of explosion." (People v. Duncan, supra, 42 Cal.3d at p. 101, 227 Cal.Rptr. 654, 720 P.2d 2.)
The Supreme Court discussed Messina, supra, 165 Cal.App.3d 937, 212 Cal.Rptr. 75 with apparent approval. (People v. Duncan, supra, 42 Cal.3d at pp. 102-103, 227 Cal. Rptr. 654, 720 P.2d 2.) It also discussed People v. Dickson (1983) 144 Cal.App.3d 1046, 192 Cal.Rptr. 897, in which "the Court of Appeal held that the smell of ether alone does not constitute an exigent circumstance." (People v. Duncan, supra, 42 Cal.3d at p. 101, 227 Cal.Rptr. 654, 720 P.2d 2.) The court concluded: "[T]here is no absolute rule that can accommodate every warrantless entry into premises housing a drug laboratory.... [T]he emergency nature of each situation must be evaluated on its own facts." (Id., at p. 103, 227 Cal.Rptr. 654, 720 P.2d 2.) "[E]ther has legitimate uses and thus its smell alone does not provide probable cause for a search or exigent circumstances excusing a warrant. [Citations.]" (Ibid.)
However, "the strong smell of ether, equally consistent with criminal and innocent activity, but in either event indicative of possible danger, justifies further investigation by law enforcement officers. [¶] If this further investigation reveals `an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence' [citation], a warrantless entry, search or arrest may be justified." (People v. Duncan, supra, 42 Cal.3d at pp. 103-104, 227 Cal.Rptr. 654, 720 P.2d 2, italics added, quoting People v. Ramey (1976) 16 Cal.3d 263, 276, 127 Cal.Rptr. 629, 545 P.2d 1333.)
In the case before it, the court found Officer Gremminger "believed an emergency existed." (People v. Duncan, supra, 42 Cal.3d at p. 105, 227 Cal.Rptr. 654, 720 P.2d 2.) It further found this belief was "reasonable under the circumstances. The extremely volatile nature of chemicals, including ether, involved in the production of drugs such as ... methamphetamine creates a dangerous environment, especially when handled unprofessionally by residential manufacturers of illicit drugs. Although an inactive laboratory with secure, well-stored chemicals may present no immediate danger, the converse applies to an ongoing operation such as found here. On these facts it was reasonable for Gremminger to believe that dangerous chemicals were being mishandled on the premises, and to act to protect life and property from that danger. His warrantless entry into defendants' residence was therefore justified by a reasonable belief that exigent circumstances requiring immediate action existed." (Ibid.)
Cases from other jurisdictions are in accord. In State v. Chapman (1991) 107 Or.App. 325, 813 P.2d 557, police officers responding to a neighbor's call found a strong smell of methamphetamine coming from a house; two fans at the back door were blowing air out of the house, and there was a thumping noise from the second story. (Id., at p. 328, 813 P.2d 557.) They concluded there was an operating methamphetamine lab inside. They called the fire department and a hazardous materials team, then entered the house. (Id., at p. 329, 813 P.2d 557.) Noting that "during the actual production of methamphetamine, there is a chemical reaction that presents a danger to the public," the court held that "a working methamphetamine lab in an environment that poses a threat of immediate harm to life and property, presents exigent circumstances justifying entry without a warrant." (Id., at p. 333, 813 P.2d 557; accord State v. Gabbard (1994) 129 Or.App. 122, 130, 877 P.2d 1217 [given probable cause to believe operating methamphetamine lab was in shed, "the danger of an explosion that could injure the officers, defendant, or the residents of the nearby house created an exigency that justified ... immediate search of the shed"], review den. 320 Or. 131, 881 P.2d 815.)
Similarly, in United States v. Echegoyen (9th Cir.1986) 799 F.2d 1271, a citizen alerted the police to the fact that a smell of ether was coming from a nearby house. (Id., at pp. 1273-1274.) The police called in firefighters, who advised them that "the flammable ether posed a serious fire hazard and that immediate action was necessary." (Id., at p. 1274.) The police entered the house and arrested the defendant. The police then reentered the house, together with the firefighters, *22 and addressed the fire hazard by turning off the burners on the kitchen stove and searching for any other open flame. (Ibid.)
The trial court held the warrantless entry was justified by exigent circumstances. The appellate court affirmed: "Exigent circumstances are `those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers and other persons, the destruction of relevant evidence, the escape of the suspects or some other consequence improperly frustrating legitimate law enforcement efforts.' [Citation.] Included within this definition of exigent circumstances is `[t]he need to protect or preserve life or avoid serious injury....' [Citations.] The record in this case establishes that the existence of an explosive fire hazard and the possibility of illegal drug activity were exigent circumstances that justified the initial warrantless entry." (United States v. Echegoyen, supra, 799 F.2d at pp. 1278-1279, fn. omitted; see also United States v. Whitten (9th Cir.1983) 706 F.2d 1000, 1014 [risk of explosion from operating methamphetamine lab, together with indications that multiple armed persons were present, constituted exigent circumstances justifying warrantless entry], cert. den. (1984) 465 U.S. 1100 [104 S.Ct. 1593, 80 L.Ed.2d 125]; United States v. Fairchild (W.D.Mo.1996) 943 F.Supp. 1174, 1181-1182 [threat of explosion from methamphetamine lab constituted danger to the public sufficient to trigger public safety exception to Miranda].)[10] These cases, decided in the Fourth Amendment context; appropriately turn on their particular facts. Nonetheless, they stand for the proposition that the mere presence of an operating methamphetamine lab represents an imminent and substantial danger to human life.
Defendant relies on the evidence that only a small minority of methamphetamine labs are actually associated with a fatality. However, "we do not understand the term `high probability' to mean greater than 50 percent. Very few activities in life, even noncriminal conduct, carry such a risk." (People v. Taylor, supra, 6 Cal.App.4th at p. 1098, 8 Cal. Rptr.2d 439.) "[C]ourts have hesitated to turn the law into a pure statistical analysis. [Citation.]" (Id., at p. 1099, 8 Cal.Rptr.2d 439, fn. omitted.) We dare say only a small minority of simple kidnappings actually result in death. Nevertheless, simple kidnapping has repeatedly been held to be inherently dangerous. (People v. Ford (1964) 60 Cal.2d 772, 795, 36 Cal.Rptr. 620, 388 P.2d 892, cert. den. 377 U.S. 940 [84 S.Ct. 1342, 12 L.Ed.2d 303]; People v. Greenberger (1997) 58 Cal.App.4th 298, 377, 68 Cal. Rptr.2d 61; People v. Pearch (1991) 229 Cal. App.3d 1282, 1296-1299, 280 Cal.Rptr. 584; see also People v. Ordonez (1991) 226 Cal. App.3d 1207, 1225-1228, 277 Cal.Rptr. 382 [kidnapping for ransom].)[11]
Similarly, in People v. Nichols (1970) 3 Cal.3d 150, 89 Cal.Rptr. 721, 474 P.2d 673, cert. den. (1971) 402 U.S. 910, 91 S.Ct. 1388, 28 L.Ed.2d 652, the Supreme Court held the felony of willfully and maliciously burning a motor vehicle (former Pen.Code, § 449a; Stats.1959, ch. 1462, § 2, p. 3757) to be inherently dangerous: "Certainly the burning of a motor vehicle, which usually contains gasoline and which is usually found in close proximity to people, is inherently dangerous to human life." (Id., at p. 163, 89 Cal.Rptr. 721, 474 P.2d 673.) This approach is inconsistent with a requirement that most, or even many, instances of commission of the felony must result in death. Here, it could equally be said that manufacturing methamphetamine, which almost always involves substances as flammable as gasoline and which is usually conducted inside inhabited structures, is inherently dangerous to human life.
*23 Defendant also relies on the evidence that a skilled person can manufacture methamphetamine "relatively" safely. A similar argument, however, was rejected in People v. Morse (1992) 2 Cal.App.4th 620, 3 Cal. Rptr.2d 343. There, the issue was whether reckless or malicious possession of a destructive device (Pen.Code, § 12303.2) is an inherently dangerous felony: "Appellant argues that because there are `conceivable [] ways of violating the statute that do not necessarily pose a threat to human life' the crime is not inherently dangerous.... [¶] We must view the elements of the offense, not the particular facts of the instant offense. In viewing the elements our task is not to determine if it is possible (i.e., `conceivable') to violate the statute without great danger. By such a test no statute would be inherently dangerous. Rather the question is: does a violation of the statute involve a high probability of death? [Citation.] If it does, the offense is inherently dangerous.
"We do not regard the question as a close one. To recklessly or maliciously possess a bomb in a residential area, as appellant did, or in any place close to people, inherently involves a high probability of death. Almost uniquely, bombs have an `inherently dangerous nature.' [Citation.] They are so dangerous that even when not set to explode, their possession violates the statute. [Citation.]... `A bomb has special characteristics which obviously differentiate it from all other objects. In the first place, the maker often loses control over the time of its detonation.... In the second place, it may wreak enormous havoc on persons and property. In the third place, its victims are often unintended sufferers. And finally, considering its vast destructive potentialities, it is susceptible of fairly easy concealment.' [Citation.]" (.People v. Morse, supra, 2 Cal.App.4th at p. 646, 3 Cal.Rptr.2d 343, quoting People v. Heideman (1976) 58 Cal.App.3d 321, 335, 130 Cal.Rptr. 349 and People v. Superior Court (Peebles) (1970) 6 Cal.App.3d 379, 382, 85 Cal.Rptr. 803, respectively.)
The dangers of manufacturing methamphetamine are closely analogous to the dangers of possessing a destructive device, as in Morse. Both felonies involve a dangerous instrumentality; its maker often loses control over it; it may wreak enormous havoc on persons and property; the victims are often unintended sufferers; and, considering its destructive potential, the dangerous instrumentality is susceptible of fairly easy concealment.
In some ways, manufacturing methamphetamine is more dangerous than possessing a destructive device. One can commit the felony of possessing a destructive device even if the device has been rendered inoperable. However, one cannot commit the felony of manufacturing methamphetamine without possessing at least some hazardous substances; without using, pouring and mixing those substances; or without applying heat. Thus, manufacturing methamphetamine "by its very nature, ... cannot be committed without creating a substantial risk that someone will be killed...." (People v. Burroughs, supra, 35 Cal.3d at p. 830, 201 Cal. Rptr. 319, 678 P.2d 894.)
We conclude the trial court correctly ruled that manufacturing methamphetamine is inherently dangerous to human life for purposes of the second degree felony-murder rule.

II

JURY INSTRUCTION THAT MANUFACTURING METHAMPHETAMINE IS AN INHERENTLY DANGEROUS FELONY
Defendant contends that, even assuming manufacturing methamphetamine is an inherently dangerous felony, giving the jury instructions to this effect unconstitutionally removed an issue of fact from the jury's consideration.
"The Due Process Clause of the Fourteenth Amendment denies states the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense. [Citation.] Jury instructions relieving states of this burden violate a defendant's due process rights, [citations.] Such directions subvert the presumption of innocence accorded to accused persons and also invade the truth-finding task assigned solely *24 to juries in criminal cases." (Carella v. California (1989) 491 U.S. 263, 265, 109 S.Ct. 2419, 2420, 105 L.Ed.2d 218.) Accordingly, they violate both the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of trial by jury. (Sullivan v. Louisiana (1993) 508 U.S. 275, 278, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182; People v. Kobrin (1995) 11 Cal.4th 416, 423, 45 Cal.Rptr.2d 895, 903 P.2d 1027.)
For example, in People v. Figueroa (1986) 41 Cal.3d 714, 224 Cal.Rptr. 719, 715 P.2d 680, the defendants were charged with selling unqualified securities (Corp.Code § 25110). Id., at p. 718, 224 Cal.Rptr. 719, 715 P.2d 680.) The trial court instructed the jury that the promissory notes the defendant sold were "securities" within the meaning of the Corporate Securities Law. (Id., at p. 723, 224 Cal.Rptr. 719, 715 P.2d 680.) The Supreme Court held this was error:
"It has long been recognized that a trial judge `may not direct a verdict of guilty no matter how conclusive the evidence.' [Citations.]... [¶] The prohibition against directed verdicts `includes the perforce situations in which the judge's instructions fall short of directing a guilty verdict but which nevertheless have the effect of so doing by eliminating other relevant considerations if the jury finds one fact to be true.' [Citation.]... `[N]o fact, not even an undisputed fact, may be determined by the judge.' [Citations.]" (People v. Figueroa, supra, 41 Cal.3d at p. 724, 224 Cal.Rptr. 719, 715 P.2d 680.) "The rule prohibiting verdicts directed against an accused emanates from the guarantee of due process and the right to a jury trial. Due process `protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged' [citation]. It requires the state to prove ` "every ingredient of an offense beyond a reasonable doubt...."' [Citation.]" Id., at p. 725, 224 Cal.Rptr. 719, 715 P.2d 680.)
"`The definition of a security is a matter of law. It is the judge's duty to instruct the jury concerning that definition: the way in which a security is identified. Whether a particular piece of paper meets that definition, however, is for the jury to decide. Of course, the question whether a generic type of document, such as a traveler's check or an equipment lease, may come within the reach of the statute's prohibition is one of law. [Citations.]' [Citation.]" (People v. Figueroa, supra, 41 Cal.3d at pp. 733-734, 224 Cal. Rptr. 719, 715 P.2d 680, fn. omitted, quoting United States v. Johnson (5th Cir. 1983 (in bank)) 718 F.2d 1317, 1321, fn. 13.)
It is useful to compare Figueroa with People v. Brown (1988) 46 Cal.3d 432, 250 Cal. Rptr. 604, 758 P.2d 1135, cert. den. (1989) 489 U.S. 1059 [109 S.Ct. 1329, 103 L.Ed.2d 597. There, the defendant was charged with murder, with the special circumstance that the victim was a peace officer engaged in the performance of his or her duties (Pen.Code, § 190.2, subd. (a)(7)). The trial court instructed the jury: `"For the purposes of these instructions, a Garden Grove Regular Police Officer and a Garden Grove Reserve Police Officer are peace officers.'" People v. Brown, supra, at p. 443, 250 Cal.Rptr. 604, 758 P.2d 1135, italics omitted.) The Supreme Court held this instruction did not unconstitutionally remove an element of the special circumstance from the jury's consideration. It explained: "The challenged final sentence took no element from the jury; it merely instructed the jury on a point of statutory lawa point not open to disputethat a Garden Grove police officer is a peace officer. [Citations.] The jury was left to make all essential factual determinations, including whether the victim was a Garden Grove police officer." (Id. at pp. 443-444, 250 Cal. Rptr. 604, 758 P.2d 1135, fn. omitted.)
Similarly, in People v. Runnion (1994) 30 Cal.App.4th 852, 36 Cal.Rptr.2d 203, the defendant was charged with robbery, with a personal firearm use allegation (Pen.Code, § 12022.5, subd. (a)), (d., at 854, 36 Cal. Rptr.2d 203.) The trial court refused to give an instruction defining "firearm"; instead, it instructed: `"The word "firearm" includes handgun.'" (Id., at p. 855, 36 Cal.Rptr.2d 203.) On appeal, the defendant contended this instruction relieved the state of its burden of proving the object the defendant *25 used during the robbery was, in fact, a firearm. (Id., at p. 856, 36 Cal.Rptr.2d 203.) The court rejected the contention: "The court did not instruct the jury that a particular element had been established, as it would have done had it instructed the jury that People's No. 6 was a firearm or a handgun. Instead, the court merely, and correctly, instructed that the legal definition of a firearm included a handgun. The jury was left to determine whether People's No. 6, the item at issue in the case before them, was a handgun." (Ibid; see also People v. Moore (1997) 59 Cal.App.4th 168, 179-187, 69 Cal. Rptr.2d 56 [in prosecution for conspiracy to misappropriate public funds, trial court properly instructed jury that Lost Hills Water District was a "district"].)
As we held in part I, ante, manufacturing methamphetamine is an inherently dangerous felony as a matter of law. Here, the challenged instructions correctly so informed the jurors. They still had to find every factual element of the crime, including whether defendant's conduct constituted the felony of manufacturing methamphetamine, and whether her children's deaths occurred during or as a direct causal result of the commission or attempted commission of this felony. Thus, the instructions are not analogous to the one struck down in Figueroa. Rather, they are analogous to the ones upheld in Brown and Runnion.. We conclude they did not take any issue of fact away from the jury.
Defendant also contends (albeit briefly) these instructions impinged on the jury's consideration of implied malice. She argues that, by instructing that manufacturing methamphetamine is "a felony inherently dangerous to human life," the trial court erroneously took the factual question of whether defendant performed an act, the natural consequences of which were dangerous to life, away from the jury.
"Defendant's contention is reviewed by asking whether there is a reasonable likelihood that the jury understood the instruction as defendant asserts. [Citation.]" (People v. Mayfield (1997) 14 Cal.4th 668, 776, 60 Cal. Rptr.2d 1, 928 P.2d 485, cert. den. ___ U.S. ___, 118 S.Ct. 116, 139 L.Ed.2d 68; see also Estelle v. McGwire (1991) 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385; Boyde v. California (1990) 494 U.S. 370, 380-381 and 380, fn. 4, 110 S.Ct. 1190, 1198, 1198, fn. 4, 108 L.Ed.2d 316.) "We determine how it is reasonably likely the jury understood the instruction, and whether the instruction, so understood, accurately reflects applicable law. [Citations.]" (People v. Raiey (1992) 2 Cal.4th 870, 899, 8 Cal.Rptr.2d 678, 830 P.2d 712, cert. den. (1993) 507 U.S. 945, 113 S.Ct. 1352, 122 L.Ed.2d 733) "Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury. [Citation.]" (People v. Holt (1997) 15 Cal.4th 619, 677, 63 Cal.Rptr.2d 782, 937 P.2d 213, cert. den. ___ U.S. ___, 118 S.Ct. 606, 139 L.Ed.2d 493.)
The instructions, taken as a whole, made it clear that implied malice and felony murder were separate, distinct and alternative theories. (Compare CALJIC No. 8.31 [second degree implied malice murder] with CALJIC No. 8.32 [second degree felony-murder]; see also CALJIC No. 8.10 (1994 rev.).)
The trial court also gave a special instruction that: "The prosecution has introduced evidence tending to prove that there are two theories upon which a conviction may be based. The defendant may be found guilty if the proof shows beyond a reasonable doubt that she acted with implied malice and/or the killing occurred as a result of the defendant manufacturing or attempting to manufacture methamphetamine, a felony inherently dangerous to human life. [¶] You will include a special finding on that question in your verdict, using a form that will be supplied for that purpose." The special finding forms required the jury to find, as to each murder count, whether "in the commission of the murder, ... defendant acted with implied malice"; and whether "in the commission of the murder, ... defendant manufactured or attempted to manufacture methamphetamine, a felony inherently dangerous to human life."
These instructions, taken as a whole, made it clear that the jury was to consider the issues of implied malice murder and felony-murder separately, and that the instructions with respect to one did not apply to the *26 other. We find no reasonable likelihood the jurors misapplied them as defendant contends.

III
RETROACTIVE APPLICATION OF THE RULE THAT MANUFACTURING METHAMPHETAMINE IS AN INHERENTLY DANGEROUS FELONY
Defendant contends a rule that manufacturing methamphetamine is an inherently dangerous felony, if applied to her, is unconstitutionally retroactive.
"[A]ny statute `"which makes more burdensome the punishment for a crime, after its commission"' violates the ex post facto prohibition of the United States Constitution [citation], and its California counterpart. [Citation.]. While this limitation is specifically directed to the legislative, not judicial, branch, the same principle applies to judicial decisions. [Citations.] Thus, `[i]f a judicial construction of a criminal statute is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue," it must not be given retroactive effect. [Citation].' [Citations.]" (People v. King (1993) 5 Cal.4th 59, 79-80, 19 Cal.Rptr.2d 233, 851 P.2d 27, quoting Collins v. Youngblood (1990) 497 U.S. 37, 42, 110 S.Ct. 2715, 2719, 111 L.Ed.2d 30 and Bouie v. City of Columbia (1964) 378 U.S. 347, 354, 84 S.Ct. 1697, 1703, 12 L.Ed.2d 894, respectively.)
"Not all judicial interpretations of statutes having a retroactive effect are prohibited, however. The United States Supreme Court has explained that the Fifth Amendment forbids only the retroactive application of an `unexpected' or `unforeseeable judicial enlargement of a criminal statute.' [Citation.] California case law is in accord. [Citations.]" (People v. Wharton (1991) 53 Cal.3d 522, 586, 280 Cal.Rptr. 631, 809 P.2d 290 cert. den. (1992) 502 U.S. 1038, 112 S.Ct. 887, 116 L.Ed.2d 790, quoting Bouie v. City of Columbia, supra, 378 U.S. at pp. 353, 354, 84 S.Ct. at pp. 1702, 1703.)
"In the case of judicial construction, due process is not violated merely because the language of the statute is being applied to a particular situation for the first time.... Nor do due process concerns of fair warning arise where the language of the statute is not being expanded in an unforeseeable manner even though the case is one of first impression and even if dicta in prior decisions suggested a narrower application...." (People v. Taylor (1992) 7 Cal.App.4th 677, 693, 9 Cal.Rptr.2d 227, quoting People v. Gibbons (1989) 215 Cal.App.3d 1204, 1210, 263 Cal. Rptr. 905.) For example, in Granite Construction Co. v. Superior Court (1983) 149 Cal.App.3d 465, 197 Cal.Rptr. 3 the court held for the first time that a corporation could be prosecuted for manslaughter (id., at pp. 467-470, 197 Cal.Rptr. 3); it then held this did not violate due process. (Id., at p. 470, 197 Cal.Rptr. 3.) Similarly, in People v. Page (1980) 104 Cal.App.3d 569, 163 Cal. Rptr. 839 the court held for the first time that forcibly tattooing another person could constitute mayhem; it also held this did not violate due process. (Id., at p. 576, 163 Cal.Rptr. 839.)
The People suggest there was no due process violation because defendant "knew her conduct, the manufacturing of methamphetamine[,] was illegal." "Underlying this argument is the view that the bar against retroactivity applies only when a new decision penalizes conduct that was completely innocent when committed." (People v. Farley (1996) 45 Cal.App.4th 1697, 1707, 53 Cal. Rptr.2d 702.) This contention, however, has been repeatedly rejected. (People v. Weidert (1985) 39 Cal.3d 836, 852, 218 Cal.Rptr. 57, 705 P.2d 380; People v. Farley, supra, 45 Cal.App.4th at p. 1707, 53 Cal.Rptr.2d 702.) The bar against retroactivity "applies equally to judicial decisions, whose effect is also to increase punishment for criminal conduct after it commission. [Citation.]" (People v. Farley, supra, 45 Cal.App.4th at p. 1707, 53 Cal.Rptr.2d 702.) Obviously, the punishment for murder is more severe than the punishment for manufacturing methamphetamine. Accordingly, the mere fact that manufacturing methamphetamine was clearly illegal would not permit a court unexpectedly and unforeseeably to punish defendant's conduct as murder.
*27 We believe there was no due process violation for a simpler reason: Our holding that manufacturing methamphetamine is an inherently dangerous felony was not unexpected or unforeseeable. Although this is a case of first impression, our holding results from the straightforward application of standard second degree felony-murder principles. We are not reversing some previous uniform appellate rule to the contrary. (See People v. Loeun (1997) 17 Cal.4th 1, 11-12, 69 Cal. Rptr.2d 776, 947 P.2d 1313; cf. People v. Davis (1994) 7 Cal.4th 797, 812, 30 Cal. Rptr.2d 50, 872 P.2d 591 [fact that several Courts of Appeal had erroneously held murder of a fetus required viability meant Supreme Court's contrary holding could not apply retroactively]; People v. King, supra, 5 Cal.4th at p. 80, 19 Cal.Rptr.2d 233, 851 P.2d 27 [fact that Culbreth rule had been "law of this state since 1976" meant Supreme Court's contrary holding could not apply retroactively].)
The analogous cases on which we rely, dealing with child endangerment and the exigent circumstances exception to the warrant requirement, clearly foreshadowed our decision. "Certainly, it cannot be said that in light of these prior decisions that [our holding] was `unexpected.' All that could be said is that the law was `unsettled,' and where the law is unsettled, `... we do not believe a defendant can be said to have reasonably relied on a particular outcome.' [Citations.]" (People v. Superior Court (Clark) (1994) 22 Cal.App.4th 1541, 1551, 28 Cal.Rptr.2d 46, quoting People v. Rhoden (1989) 216 Cal. App.3d 1242, 1256-1257, fn. 21, 265 Cal.Rptr. 355 and People v. Carr (1988) 204 Cal.App.3d 774, 779, 251 Cal.Rptr. 458.)
Finally, it is significant that, as already noted, a felony may be deemed inherently dangerous only if a person who chooses to engage in it can anticipate the likelihood that death will result, and hence can be deterred by a rule that, if death does in fact result, he or she may be punished for murder. The very foreseeability of death suggests our holdingthat manufacturing methamphetamine is an inherently dangerous felonyis itself foreseeable.
We conclude our holding that manufacturing methamphetamine is an inherently dangerous felony can be applied retroactively to defendant's conduct without in any way violating due process.

IV

V

THE SUFFICIENCY OF THE EVIDENCE OF IMPLIED MALICE
Defendant contends there was insufficient evidence to support the jury's findings of implied malice.
"In reviewing the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] `[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidencethat is, evidence which is reasonable, credible, and of solid valuesuch that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We `"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.]" (People v. Davis (1995) 10 Cal.4th 463, 509, 41 Cal.Rptr.2d 826, 896 P.2d 119, cert. den. (1996) 516 U.S. 1121, 116 S.Ct. 932, 133 L.Ed.2d 859.)
"[I]mplied malice has both a physical and a mental component, the physical component being the performance of ` "an act, the natural consequences of which are dangerous to life,"' and the mental component being the requirement that the defendant'"knows that his conduct endangers the life of another and... acts with a conscious disregard for life."' [Citations.]" (People v. Hansen, supra, 9 Cal.4th at p. 308, 36 Cal.Rptr.2d 609, 885 P.2d 1022, quoting People v. Patterson, supra, 49 Cal.3d at p. 626, 262 Cal.Rptr. 195, 778 P.2d 549, quoting People v. Watson *28 (1981) 30 Cal.3d 290, 300, 179 Cal.Rptr. 43, 637 P.2d 279.) "[A] finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved, i.e., a subjective standard. [Citation.]" (People v. Watson, supra, 30 Cal.3d at pp. 296-297, 179 Cal.Rptr. 43, 637 P.2d 279.)
"Implied malice, like all other elements of a crime, may be proven by circumstantial evidence. [Citations.]" (People v. Garcia (1995) 41 Cal.App.4th 1832, 1849, 50 Cal.Rptr.2d 127.) "The very nature of implied malice ... invites consideration of the circumstances preceding the fatal act. [Citations.]" (People v. Nieto Benitez (1992) 4 Cal.4th 91, 107, 13 Cal.Rptr.2d 864, 840 P.2d 969.)
In People v. Morse, supra, 2 Cal.App.4th 620, 3 Cal.Rptr.2d 343, the defendant built two linked "master and slave" bombs. The police found them in his garage; they disarmed one, but while they were trying to disarm the other, it exploded, killing two officers. (Id., at pp. 631-634, 3 Cal.Rptr.2d 343.) The defendant argued he lacked the necessary subjective awareness of the danger; he pointed out that he and his family lived and slept next to the garage. (Id., at p. 652, 3 Cal.Rptr.2d 343.) The appellate court, however, found sufficient evidence of implied malice: "[A]ppellant made a linked slave-and-master bomb whose only purpose was to kill people; he stored the bomb in his garage, part of a residential neighborhood; the bomb would explode if a soldered wire touched a nearby metal plate; only a piece of rubbertube [sic] protected the triggering contact; ... appellant threatened to blow up [a relative]; on February 8, 1986, appellant knew the police were going to search his garage and might find his bomb; on February 8, 1986, [at] approximately 10 a.m. appellant knew the police had found and had moved the slave bomb; about an hour later, when an expert attempted to dismantle the master bomb, it exploded with a `deafening noise,' dismembering and killing two people." (Id., at pp. 652-653, 3 Cal.Rptr.2d 343.)
Here, there was evidence defendant was extracting pseudoephedrine for use in manufacturing methamphetamine. In the course of this, she was pouring either Coleman fuel or acetone into a pan. There was evidence the pan was over an open flame on a burner of the stove. Alternatively, there also was evidence the pan was on a hot plate on the kitchen counter, not far from the pilot light of the stove.. Defendant was working in the cramped confines of a mobile home. Her three youngest children were either in the kitchen or in the adjacent living room. Defendant essentially admitted there was an open bucket of Coleman fuel nearby (although she claimed it was there solely to fuel the generator). She kept additional Coleman fuel and acetone around  possibly even in the kitchen. She also kept flammable red phosphorus on hand.
Fire investigator David Lowe testified that pouring Coleman fuel or acetone over or near an open flame will result in an immediate explosion. Although pouring Coleman fuel over a hot plate would be somewhat safer, it would still be dangerous; if the hot plate were hot enough, it could ignite the Coleman fuel. Special Agent Ken Riding agreed it is dangerous to use either Coleman fuel or acetone to extract ephedrine, because they can be ignited by an open flame or a hot plate. And we know, of course, that a flammable liquid did ignite in the kitchen that day. These circumstances afforded sufficient evidence defendant did an act the natural consequences of which are dangerous to life.
In addition, defendant practically admitted subjective awareness of the resulting risk. She testified:
"Q. So if you were using [Coleman fuel] around a stove, that would be very dangerous, wouldn't it?
"A. It would be very stupid, yes. It would be dangerous.
"Q. And you know that now; is that right?
"A. Oh, no. I've always known that."
When asked if "[m]eth labs explode," defendant answered, "Yes, they do, especially if somebody doesn't know what they are doing. It's obvious. I read it in the paper all the time." Later, she claimed she learned this only after her own fire. However, given her *29 admission she had been manufacturing methamphetamine for at least ten years, the jury was entitled to conclude she really knew this much earlier.
The cans of acetone bore large red warning labels stating: "Dangerous," "Flammable Liquid," and "Extremely Flammable." The cans of Coleman fuel bore similar warning labels. Defendant admitted reading these labels. She also indicated subjective awareness of the risk by testifying she tried to avoid adding any heat to the manufacturing process. Despite her claim, however, there was evidence she would mix Mini-Thin tablets with Coleman fuel or acetone and then "boil them down."
Harry Jensen had told defendant she should not manufacture methamphetamine with her children around, and she should get another place to work. Richard Jones had told her "her kids were going to get hurt," and had threatened to move out. Kristy Barton, too, told her it was dangerous. Kim Hartigan told defendant it was "crazy having this around the kids." At the time of the fire, defendant had already found a new place for her "cooking" activities; she had had Jensen pack up her chemicals and equipment.
Defendant tried to turn her subjective awareness of the risk to her advantage, by introducing evidence she was a skilled and careful "cooker" and suggesting she would never have done anything so stupid as to pour Coleman fuel near an open flame. The jury, however, did not have to credit defendant's testimony. Defendant claimed she "cooked" solely in the back bathroom, and never in the presence of her children, but Barton had seen defendant cooking at least once in the front bathroom. Kloos had seen defendant finishing the "cooking" process in the kitchen, while two of her children were nearby.
Even if the jury did credit defendant's testimony, there was evidence that, on the day of the fire, she deviated from her usual safe "cooking" practices. She needed money urgently. She had just returned from collecting money owed to her for drugs; she had spent all the proceeds in a Christmas shopping spree. Jones and Barton were asleep in the bedroom, blocking access to the back bathroom. Also, the toilet in the back bathroom was stopped up. Finally, even accepting defendant's testimony that she normally kept her chemicals and supplies in the back bathroom, she admitted they had been packed up and moved outside. For these reasons, defendant may well have decided just this once, and despite her awareness of the dangerto begin manufacturing methamphetamine in the kitchen.
We conclude there was sufficient evidence that defendant performed an act, the natural consequences of which were dangerous to life, with the knowledge that her act endangered the life of others, and with conscious disregard for human life, to support the jury's finding that she acted with implied malice.

DISPOSITION
The judgment is affirmed.
RAMIREZ, P.J., and HOLLENHORST, J., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I.C., and IV.
[**] Editor's Note: The opinion is republished here to include parts II and III pursuant to March 30, 1998 certification of partial publication.
[1] Coleman fuel, also known as "white gas," is a petroleum distillate. (See Haysom v. Coleman Lantern Company, Inc. (1978) 89 Wash.2d 474, 476, 573 P.2d 785.)
[2] Jensen had pleaded guilty to conspiracy to manufacture methamphetamine in exchange for a prison term of up to seven years,
[3] Barton testified Jensen was "all burnt." Jones testified Jensen "had skin dripping off his hands."
[4] Talbert had pleaded guilty to conspiracy to manufacture methamphetamine, and agreed to testify truthfully in this case, in exchange for a one year term.
[5] Talbert, Jones and Barton confirmed this. Barton had told police, however, she once saw defendant "cooking" in the front bathroom.
[6] Jones thought the generator only ran on, gasoline, and would not run on Coleman fuel.
[7] Although this particular quotation is from the lead opinion, which was signed only by Justice Kennard, three other justices concurred "in the judgment." (People v. Patterson, supra, 49 Cal.3d at p. 627, 262 Cal.Rptr. 195, 778 P.2d 549 [cone. and dis. opn. of Lucas, C.J., joined by Eagleson and Kaufman, JJ.].) The judgment included the remand for further proceedings. Thus, we view this as a holding of the court.
[8] People v. Kelly (1976) 17 Cal.3d 24, 130 Cal. Rptr. 144, 549 P.2d 1240; Frye v. United States (D.C.Cir. 1923) 293 F. 1013.
[***] See footnote *, ante.
[10] The only cases we have found which held a warrantless entry into an apparently operating methamphetamine lab was not justified by exigent circumstances turned on the fact that the conduct of the police was inconsistent with the claimed exigency. (State v. DeWitt (1996) 184 Ariz. 464, 468, 910 P.2d 9; Stewart v. State (Tex.App.1984) 681 S.W.2d 774, 778.)
[11] Proposition 115, effective June 6, 1990, added simple kidnapping to the list of felonies which trigger application of the first degree felony-murder rule. (Pen.Code, § 189.)  See footnote *, ante.