Filed 4/30/14  P. v. Parker CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DION C. PARKER,<br><br>Defendant and Appellant. | B247405<br><br>(Los Angeles County<br>Super. Ct. No. MA047683) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  David Walgren, Judge.  Affirmed as modified.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Eric E. Reynolds and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Dion Parker (Parker) appeals from a judgment entered after a jury found him guilty of second degree murder and assault on a child causing death involving his eight-month-old daughter. The trial court sentenced him to 25 years to life in prison. He contends neither conviction is supported by substantial evidence. We reject this contention. He also contends, and the Attorney General concedes, he is entitled to one additional day of custody credit. We modify the judgment to correct Parker's custody credits. As so modified, we affirm the judgment.

**BACKGROUND**

**Prosecution Evidence**

The victim, baby Dionne Parker (Dionne), was the daughter of Parker and Barbara Sloan. Dionne was born in early April 2009. Parker first met his daughter Dionne in July 2009, when she was two months old. Thereafter, Parker helped Sloan care for Dionne. During Dionne's life, Sloan started consuming alcohol "a lot" and taking the drug ecstasy. Taking care of Dionne sometimes overwhelmed Sloan and she would ask Parker or other relatives to watch Dionne.

Around the time of the December 8, 2009 incident, Parker usually stayed at Sloan's home a few nights a week with Sloan, her eight-year-old son Romeo, and Dionne. Parker would spend the other nights of the week at a cousin's home. For a few nights leading up to December 8, 2009, Parker had been staying at Sloan's home with Sloan, Romeo and Dionne.

**The December 8, 2009 incident and investigation**

Eight-month-old Dionne had been ill with a cold for about a week and was fussy and crying during the evening of December 7, 2009. Dionne slept that night in bed with Sloan and Romeo. Parker slept on the couch in the living room. This was their normal sleeping arrangement in the days leading up to December 8, 2009. Dionne woke early on December 8, 2009, at about 7:00 a.m. According to Sloan's trial testimony, Dionne was "ready to play" and was not crying that morning. Sloan asked Parker if he could take Dionne out of the bedroom so she "could get a couple more minutes of sleep." Parker

brought Dionne to the living room, placed her in her playpen, and he went back to the couch.

Sloan and Romeo left home at about 8:00 a.m. on December 8, 2009. Sloan's cousin Roisha picked them up. Roisha dropped off Romeo at the corner so he could walk to school with his friends. She drove Sloan to her home so Sloan could help her babysit. Roisha lived close to Sloan, "[j]ust a couple houses away on the other block." When Sloan left, Dionne was still in her playpen and Parker was on the couch. Dionne was wearing "[a] onesie."

Thirty to 40 minutes later, Parker knocked on the door of Roisha's home. Parker was holding Dionne, who was wrapped in a towel and wearing only a diaper. Sloan noticed that Dionne had blood on the bottom of her lip and was having difficulty breathing. Dionne did not have blood on her lip when Sloan left home. Sloan talked to Dionne but the baby was unresponsive. Sloan asked Parker what happened. Parker told her Dionne "pooped on herself," so he left her on the couch and went to get the bath ready. When he returned, Dionne was not breathing. Sloan did not see any feces on Dionne. Parker also stated that he had tried to give Dionne CPR before leaving Sloan's home. He continued to try to administer CPR at Roisha's home. At 8:43 a.m., Sloan dialed 911.

Sergeant Theresa Dawson from the Lancaster Sheriff's Station was the first responder to arrive at Roisha's home. Parker, Sloan, Roisha and two small children were outside, frantically waving at Sergeant Dawson and yelling for her to come inside and attend to the baby who was not breathing. Parker appeared excited and concerned, and he adamantly asked about the whereabouts of the ambulance. Sergeant Dawson observed Dionne on the couch "with her arm[s] outstretched to her sides, laying there motionless with her eyes fixed open." Dionne was not blinking or moving. She was limp when Sergeant Dawson picked her up. Dionne's skin was discolored, but Sergeant Dawson did not notice any injuries on her, other than a "scratch" or "little white mark" on her neck. Sergeant Dawson checked Dionne, but could not hear breath sounds or feel a pulse. She began administering CPR. At that point, she noticed that Dionne had a cut on her lip and

3

an injury in her mouth. There was a red substance on Dionne's mouth. Other deputies from the Lancaster Sheriff's Station arrived. After another minute or two, fire department personnel arrived and the paramedics took over administering CPR.

When Deputy Kenneth Saylor arrived at Roisha's home, Parker was still outside asking about the paramedics who were not yet on the scene. Deputy Saylor went inside and saw Sergeant Dawson administering CPR to Dionne. He observed Dionne and noticed blood on her lip, but he did not notice any bruising on her face.[1] Deputy Saylor went back outside and asked Parker what had happened to Dionne. Parker told the deputy the same story he had told Sloan—that Dionne "had a messy diaper," so he left her to go get the bath ready, and when he returned she was having trouble breathing and was wheezing. He tried to administer CPR. Parker explained that there was no telephone at Sloan's home, so he ran with the baby to Roisha's home so Sloan could dial 911 on her cell phone. Deputy Saylor asked Parker about the blood on Dionne's lip. Parker stated that Dionne had fallen off the bed a week or two before December 8, 2009. Deputy Saylor also asked Parker if Dionne had been sick. Parker stated that Dionne had been coughing and crying.

Deputy Saylor and Parker went inside Roisha's home. The paramedics questioned Parker about what had happened to Dionne. Parker told them the same things he had told Deputy Saylor about the messy diaper and the bath and returning to find Dionne having difficulty breathing. He also told the paramedics that Dionne had fallen two feet off the bed onto carpeted ground a week or two before December 8, 2009. The paramedics asked Parker if he had sought medical treatment for Dionne after the fall and he stated he had not.

---

[1] When Deputy Chris Voda first arrived at Roisha's home and observed Dionne he noticed "red fluid around her lip area," but he did not notice bruising on her forehead. Later, after paramedics arrived and took over administering CPR from Sergeant Dawson, Deputy Voda noticed bruising on Dionne's forehead and "a small white scratch on her neck."

4

Parker told Sergeant Dawson that Dionne had been sick for a "week and a half or two," and "she had been extremely fussy," and Parker "had been trying to console her and he wasn't able to do that." Sergeant Dawson asked Parker if Dionne had suffered any injuries. Parker said Dionne had sustained a cut on her lip when she fell off the bed about a week before December 8, 2009. Sergeant Dawson asked Parker "if he had gotten medical treatment for the child, and he said no." After hearing Parker's statements to paramedics and questioning him herself, Sergeant Dawson contacted the child abuse unit, the Special Victim's Bureau, because "things weren't adding up" and "didn't feel right."

Dionne was transported to Antelope Valley Hospital. Deputy Saylor collected a towel with spots of blood on it from the couch in Roisha's home where paramedics had been administering CPR to Dionne.

Deputies drove Parker to Sloan's home so Parker could put on appropriate clothing and shoes before going to the hospital. Sergeant Dawson met them at Sloan's home shortly thereafter. She wanted to see the location and have Parker explain to her how Dionne had fallen a week or two before. When Sergeant Dawson entered Sloan's home, she saw "a brown substance like a splash" on the heater or air conditioning unit that she thought might have been blood. She also observed possible blood stains on a pillow and blankets in the playpen, and a spot on a couch cushion which was on the floor in the living room. In the bedroom, she noticed a "brown substance on the wall behind the bed where the headboard was" and a brown substance on a pillow.

Deputy Voda conducted a videotaped interview of Parker at Sloan's home. The prosecutor showed the video to the jury. A transcript of that interview is included in the record on appeal. Parker told Deputy Voda the same things he had told the deputies and paramedics at Roisha's home about the messy diaper and the bath and returning to find Dionne having difficulty breathing. Parker also told Deputy Voda that Dionne had been congested, and on December 7, 2009, "she was crying all day, crying, crying, crying, crying, crying." Deputy Voda asked Parker about "the last time" Dionne fell off the bed and Parker said it was "a couple of days ago." Parker stated that Dionne "messed her lip up" as a result of that fall. Parker denied that Dionne had fallen on December 8, 2009.

5

Detective Cecilia Barragan, a deputy with the Special Victim's Bureau, went to Antelope Valley Hospital on December 8, 2009 and observed Dionne. Her partner, detective Timothy O'Quinn, took photographs of Dionne before doctors took her into surgery. The prosecutor showed the photographs to the jury. The photographs depict bruising on the right side of Dionne's face, "from the upper portion of her forehead down to her lower ear," "a large bump on her head along with dark bruising from the front of her head down the left side," a scratch on her neck, a "bite mark" on her left shoulder, and bruising, swelling and scratches with dried blood on her feet.

Detectives Barragan and O'Quinn interviewed Parker at Antelope Valley Hospital. The prosecutor played an audio recording of the interview for the jury. A transcript of that interview is included in the record on appeal. Parker told the detectives the same things he had said earlier about the messy diaper and the bath and returning to find Dionne having difficulty breathing. Detective O'Quinn asked Parker if Dionne had fallen off the bed the night before when she was sleeping with Sloan, and Parker said he did not believe she had. O'Quinn also asked Parker if Dionne had any marks or bruises on her that morning. Parker mentioned a bruise on her forehead and a cut on her lip from when she had fallen off the bed onto the carpet a few days before. Parker stated that Dionne had acted normally after that fall.

The detectives showed Parker a photograph of bruising on Dionne's head, and Parker said the bruising must have resulted from the fall off the bed. The detectives also showed Parker a photograph of a scar on Dionne's neck. According to Parker, Sloan said a picture frame fell on Dionne and cut her neck about a month before when Dionne reached for something and the picture fell. Parker stated a photograph of Dionne's arm showed a bite mark Dionne sustained when Sloan left Dionne with her sister and her sister's children.[2] Parker believed one of the children had bitten Dionne. The detectives told Parker it appeared that Dionne's toenails had been crushed. Parker stated Dionne

_____

[2] Sloan's sister and her sister's children had lived temporarily at Sloan's home during the latter part of Dionne's life.

had a habit of putting her feet in her mouth and Sloan told him that was why her toenails looked like that. The detectives showed Parker photographs of the marks on Dionne's ankles and Parker said he believed those injuries resulted from the prior fall. When Detective O'Quinn told Parker that Dionne had a fresh brain injury which "happened within the last several hours," Parker responded, "It couldn't have."

Detective Barragan went to Sloan's home with a search warrant and the assistance of technicians from the crime lab. In searching the premises she exited the back door and discovered a washing machine and a dryer. Inside the washing machine were baby clothes (a white onesie, a green and white sleeper and a pair of white socks), which were soaking wet.[3] The clothes were examined and there were no blood stains found on them. A criminalist determined that blood stains on a pillow from the playpen, another pillow, a towel, and the front of the washing machine were from Dionne's blood.[4]

Parker agreed to go to Detective O'Quinn's office on December 8, 2009 for a further interview. Deputy Scott Mitchell conducted a videotaped interview there. The prosecutor showed the video to the jury. A transcript of that interview is included in the record on appeal. Parker told Deputy Mitchell he had a lot of stress in his life because he had been unable to find a job. He also stated that Dionne "crie[d] a lot" and it was frustrating. Parker told Deputy Mitchell he dropped Dionne twice. He explained that he was "scared" and "didn't mean to do this to my daughter." Parker stated that a couple of days before, when Dionne "was just so fussy," he put her on the couch and she fell off. He said the same thing happened again on the morning of December 8, 2009—he put Dionne on the couch so he could get the bath ready to clean her up after she pooped, and he turned around and she fell off the couch onto the hardwood floor. He told Deputy

---

[3] Sloan testified at trial that she did not put those items in the washing machine and she did not know if they were in the washing machine when she left home in the morning on December 8, 2009.

[4] Sloan testified that when she left home in the morning on December 8, 2009, she had not seen the dark reddish spots on the pillow in the playpen and on a towel and a pillow in her bed, depicted in photographs shown at trial.

7

Mitchell, "That's the honest to God truth" about what happened on December 8, 2009. Parker added, "I got frustrated, I dropped her."

Later in the interview, Parker told Deputy Mitchell he would tell him the truth about what happened that morning. Parker stated that Dionne had been crying since the day before, and she continued to cry when he placed her in her playpen that morning so Sloan could go back to sleep. On a scale of 1 to 10, Parker's frustration level was at an 8. After Sloan and Romeo left, Parker tried giving Dionne a pacifier and then a bottle, but she would not take either one and she continued to cry. In describing Dionne's demeanor, Parker stated, "And it wasn't no cries, it was screaming like, you know like 'AAHHHHH, AAHHHHH!'" Parker changed Dionne's diaper after she pooped, but that did not calm her down. He walked around holding her and patting her. Parker stated: "So I'm walking around like, 'Citas [Dionne's nickname], okay, okay, okay, okay, and by then it's just like my head, just the crying, my head is pounding, you know pounding. I just wanted to get her to be quiet. So I'm walking around the house, walking around the house, walking around the house, and she's still screaming and screaming and screaming. So then I just yell, 'AAAAHHHHH!', and when I went, 'AAAAHHHHH!', she fell." Parker further explained that "when [he] just lost it" and screamed, "AAAHHH!", he put both hands up to his head and dropped Dionne. Parker believed Dionne hit the floor head first. He denied that she bled. He also denied that he threw Dionne on the floor, but admitted he dropped her on the floor and allowed her to fall because he was frustrated.

Deputy Mitchell told Parker it appeared that Dionne had two bumps on her forehead and he asked Parker how she sustained the other one. Parker stated that a couple of days to a week before December 8, 2009, he was not feeling well and he passed out while holding Dionne, and they both fell to the ground head first. Parker sustained facial injuries, which he pointed out to Deputy Mitchell, and he claimed that Dionne sustained bruising to her face. When he regained consciousness, Dionne was lying beside him on the floor. She was not crying. Parker called Sloan and told her to come home. After Sloan came home, Parker was throwing up blood for the rest of the day. Deputy Mitchell told Parker there was blood found in Dionne's playpen, and Parker said

8

it was from the day he passed out because Dionne cut her lip when they fell. Parker did not take Dionne to the doctor on that occasion because he could not find a ride.[5]

After this interview, Detective O'Quinn transported Parker to the Lancaster Sheriff's Station. Parker asked the detective if he could write a letter to Sloan. Detective O'Quinn agreed. In the letter, Parker stated that he dropped Dionne by accident. He explained that Dionne was screaming, so he screamed, and he grabbed his head with both hands, not remembering that Dionne was in his arms.[6]

Sergeant Dawson saw Parker at the Lancaster Sheriff's Station at about 7:00 p.m. on December 8, 2009. He approached her and said, "'I'm sorry I lied to you earlier about what happened.'" Parker told her "he had the baby on his shoulder, and she was fussy, and he couldn't get her to stop crying, and he just got frustrated and he went 'Wheooo,'" and he threw his hands up in the air in front of him.

No witness who testified at trial had seen Parker inflict any injury on Dionne.

**Testimony from Dionne's treating physicians regarding her injuries**

Dr. Mukesh Misra is a neurosurgeon who performed brain surgery on Dionne on December 8, 2009 at Antelope Valley Hospital. Dionne had "a very large blood clot in

---

[5] At trial, Sloan, Parker's mother (Cora Martin), and Parker's cousin (Jarvis Breatlove) all testified that Parker had told them before December 8, 2009 about the incident during which he had passed out while holding Dionne. Prior to December 8, 2009, Sloan had seen a bruise on Dionne's left eye and a bruise on the back of Dionne's head that she attributed to Dionne falling when Parker passed out. Sloan also was aware prior to December 8, 2009 of the scratch mark on Dionne's neck from the picture frame and of injuries to Dionne's two big toenails from putting her feet in her mouth. She was not aware of any other visible injuries on Dionne's body at the time she left home in the morning on December 8, 2009. A bite mark Dionne had sustained on her shoulder in October 2009 from an unknown source already had healed, according to Sloan. Sloan testified that she did not inflict any injuries on Dionne, but she felt like she failed to protect her because she did not know about all of Dionne's injuries and where they came from. After Dionne died, Sloan pleaded guilty to felony child abuse and served half of a four-year sentence.

[6] The trial exhibits were transmitted to this court and we have reviewed them, including Parker's handwritten letter (People's Exh. No. 40).

9

her brain" that "was causing a tremendous amount of pressure into the brain." Dr. Misra opened Dionne's skull and removed the blood clot. The bleeding in Dionne's brain was "acute," meaning that it was from a recent injury. The blood was bright red. There was no darker blood in her brain which would have indicated an older injury. The membranes in her brain "were recently bruised and fresh from the recent trauma." The bleeding in Dionne's brain was not consistent with a "rebleed" from a prior brain injury. Based on what Dr. Misra saw when he operated on Dionne, he determined that the injury would have been instantaneously incapacitating. A rebleed typically does not cause instantaneous incapacitation. After surgery, Dionne was transferred to Loma Linda Children's Hospital for further care.

Dr. Amy Young is a forensic pediatrician at Loma Linda Children's Hospital, who is board certified in child abuse pediatrics. On December 9, 2009, Dr. Young was called in to consult on Dionne's case. Dionne was in a coma after her craniotomy at Antelope Valley Hospital. Dr. Young observed Dionne and photographed her injuries. The prosecutor showed the photographs to the jury.

Dionne's feet were swollen, with "curve linear bruising" on the top and bottom, gouge marks and scabs on the ankle and heel, bruising on her toes and blood under her big toenails. According to Dr. Young, the curve linear bruising was consistent with bite marks caused by adult teeth. The toe injuries were consistent with "a crush injury to the toe." The injuries to Dionne's feet appeared recent, or acute, based on the nature of the swelling, redness and bruising.

Dionne also had bite marks on both of her thighs, her left knee, her left upper arm, and both of her hands, which appeared recent based on the swelling, redness and bruising. Abrasions on her neck were consistent with a recent strangulation injury.[7] Dr. Young also observed an older injury on Dionne's neck where the scab had fallen off.

_____

[7] A photograph of Sloan's living room taken after the incident shows a belt on the floor near a Christmas tree. Sloan testified that she did not see the belt when she left home in the morning on December 8, 2009, and she did not know whose belt it was.

Dionne also had a "very distinct S-shaped marking on her nose" and some of the skin on her nose had been rubbed off.

According to Dr. Young, "Dionne had a lot of pretty significant mouth injuries," which appeared recent and bled when Dr. Young touched them. The skin along her bottom lip and onto her chin was rubbed off. She had a large cut inside her upper lip where the tissue (the frenulum) had torn away from the base. She had puncture wounds inside her lower lip. Dr. Young believed the cause of these injuries was "multifactorial," consistent with smothering, something being shoved into Dionne's mouth, and being struck in the face. Dr. Young did not believe these injuries could have been caused by intubation or CPR.

Dionne had swelling and bruising on her upper eyelids and her mid-forehead. She had a patch of broken hair on the other side of her head from where she had surgery, consistent with her hair being pulled out. X-rays showed two fractures on each of Dionne's legs, and a fracture on each of Dionne's arms. Most of the fractures appeared two to three weeks old. One fracture on Dionne's arm, a chip off the bone on her right humerus, appeared recent because there was no evidence that it had started to heal.

Photographs of Dionne's eyes showed hemorrhaging. Dr. Young explained that, "In her right eye, basically all the normal retina had been obliterated." There was only "hemorrhage and blood in her retina." There was a fold inside the retina, meaning that "there ha[d] been injury to the retina that ha[d] taken the retina and split it and pushed it up on itself." There also were "blood hemorrhages that go throughout the entire retina in the left eye" as well as "a fold in her left eye." Photographs of Dionne's left eye showed "very little normal retina." According to Dr. Young, "this is the most severe eye findings you can see in an infant." These eye injuries were consistent with "massive acceleration deceleration" of the head which "can pull traction on the retina and causes the retina to fold on itself." Injuries such as these had been documented in cases where children were in car accidents and ejected from the car.

C.T. scans depicted blood in the subdural and subarachnoid spaces of Dionne's brain. The scans also depicted a skull fracture in the back of Dionne's head in the right

11

side of her occipital bone, which appeared to extend into the temporal bone at the base of her skull.

Dr. Young opined that the cause of the injuries to Dionne's retinas and brain "was repeated acceleration deceleration in conjunction with some sort of blunt impact." These injuries were not caused by someone tossing Dionne in the air,[8] jiggling her to calm her down, dropping her onto a hardwood floor while holding her at shoulder level, or a fall from a couch or a bed. The injuries were caused by "a very violent act" like "swinging a baby around and impact[ing] their head on something." Dr. Young had treated children who had fallen out of two-story windows who did not have the severity of injuries Dionne had. The symptoms Dionne experienced on December 8, 2009 would have occurred immediately after she was injured. Her injuries were not consistent with a rebleed from a prior injury. Dr. Young testified that Dionne could not have sustained the injuries to her retinas and brain prior to the date she lost consciousness.

Dionne died on December 12, 2009, after being declared brain dead.

**Defense Evidence**

Dr. David Posey, a forensic pathologist, testified for Parker. He believed Dionne's C.T. scans showed an acute (recent) brain injury from a fall on December 8, 2009, and a subacute (older) brain injury which had occurred four to eight days before. A radiologist from Antelope Valley Hospital noted a subacute injury. Dr. Posey examined microscopic slides from Dionne's autopsy and "saw evidence of a fresh, or acute, bleed" in her brain, and also saw "the presence of a very thin membrane," indicating a subacute injury in the brain. Dr. Posey opined that a second injury from a fall on December 8, 2009 caused a rebleed of an older brain injury. Dr. Posey stated that the fracture in Dionne's skull appeared to be "an old fracture that's healing," and could be related to the subacute bleed. The hemorrhages in her eyes were due to swelling in her brain. Dr. Posey did not observe evidence of a blunt force injury which would have caused the optic hemorrhages.

---

[8] Parker's mother, Cora Martin, testified that she had seen Sloan and Romeo throw Dionne in the air.

12

There was no bump on Dionne's head visible in the coroner's photographs which indicated an impact site. Dr. Posey believed Dionne's injuries were consistent with Dionne falling when Parker passed out and then Dionne falling again a few days later when Parker dropped her. The brain injury on December 8, 2009 would not have been lethal if not for the subacute injury. Dr. Posey did not believe the acute injury was caused by excessive force.

In discussing Dionne's other injuries, Dr. Posey stated that he could not date the bruises on Dionne's body absent an examination of tissue samples reviewed under a microscope. He did not believe marks on Dionne's neck were indicative of strangulation because there did not appear to be damage beneath the skin. Scabs and bite marks on Dionne's body appeared to be older injuries that occurred before December 8, 2009, because there was evidence of healing. Dr. Posey believed the torn frenulum in Dionne's mouth was caused by intubation or resuscitation efforts.

Parker's mother, Cora Martin, testified for the defense. She also testified for the prosecution. In the defense case, she stated that when she first saw Dionne on July 2, 2009, before Parker had begun caring for her, she was dirty, smelled bad and appeared not to have been bathed in days. On November 28, 2009, Martin observed a cut on Dionne's ear after Dionne had been with Sloan. On one occasion, Martin saw Sloan grab and twist Romeo's arm. Between July and November 2009, Martin noticed that Dionne had a bald spot on her head.

**Verdicts and Sentencing**

The jury found Parker guilty of second degree murder (Pen. Code, § 187, subd. (a);[9] count 1), and assault on a child causing death (§ 273ab; count 2). The trial court sentenced Parker to 25 years to life on count 2, and imposed and stayed a term of 15 years to life on count 1.

---

[9] Further statutory references are to the Penal Code.

13

**Sufficiency of Evidence Supporting Convictions**

Parker contends neither of his two convictions is supported by substantial evidence. With regard to his second degree murder conviction, he argues there is insufficient evidence demonstrating he acted with malice aforethought, either express or implied. With regard to his conviction for assault on a child causing death, he argues there is insufficient evidence demonstrating he acted with an awareness of facts "that would lead a reasonable person to realize that his act by its nature would probably result in great bodily injury to the child."

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.]" "'"""If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]'" [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

**Second degree murder**

The unlawful killing of a human being with malice aforethought is murder. (§ 187, subd. (a).) As set forth in section 188, "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when

the circumstances attending the killing show an abandoned and malignant heart. [¶] When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice."

California courts "have interpreted implied malice as having 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." [Citation.]' [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.) "An act is dangerous to life, for purposes of implied malice, when there is a high probability it will result in death." (*People v. Calderon* (2005) 129 Cal.App.4th 1301, 1310.)

"'Implied malice, like all other elements of a crime, may be proven by circumstantial evidence. [Citations.]' [Citation.] 'The very nature of implied malice . . . invites consideration of the circumstances preceding the fatal act. [Citations.]' [Citation.]" (*People v. James* (1998) 62 Cal.App.4th 244, 277-278.)

Substantial evidence presented at trial demonstrates Parker acted with implied malice when he inflicted injuries on Dionne on December 8, 2009 which resulted in her death. Dionne was alert and ready to play when Sloan and Romeo left home in the morning on December 8, 2009. After being in Parker's sole care for a period of about 40 minutes, she stopped breathing. The medical evidence presented by the prosecution indicates that the lethal brain injuries Dionne suffered were inflicted on December 8, 2009 by violent acts consistent with repeated acceleration and deceleration—shaking or swinging—in conjunction with blunt impact. Such acts obviously are dangerous to the life of an eight-month-old baby. The severity of the injuries inflicted on Dionne—the retinal hemorrhaging and folds, and the bleeding in the brain—indicate that Parker acted with a conscious disregard for Dionne's life. He was frustrated and angry and wanted to

15

silence Dionne's unrelenting cries. Parker's repeated lies about the manner in which Dionne sustained her injuries—that she had not fallen or hit her head, but had merely stopped breathing when he went to get the bath ready—indicate he knew his conduct endangered her life.

Parker asks this court to ignore the medical evidence presented by the prosecution and make a finding that Parker accidentally dropped Dionne on December 8, 2009. This we cannot do in applying the substantial evidence test. It was the jury's task to determine the credibility of witnesses.

### Assault on a child causing death

Section 273ab, subdivision (a), states, in pertinent part: "Any person, having the care or custody of a child who is under eight years of age, who assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life." "[A] defendant may be guilty of an assault with the meaning of section 273ab if he acts with awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act. [Citation.] The defendant, however, need not know or be subjectively aware that his act is capable of causing great bodily injury. [Citation.] This means the requisite mens rea may be found even when the defendant honestly believes his act is not likely to result in such injury." (*People v. Wyatt* (2010) 48 Cal.4th 776, 781.)

The substantial evidence demonstrating Parker acted with implied malice when he inflicted injuries on Dionne on December 8, 2009, summarized above, also demonstrates Parker acted with an awareness of facts that would lead a reasonable person to realize that great bodily injury would directly, naturally, and probably result from his act. The evidence indicates Parker engaged in violent acts against this eight-month-old baby which caused instantaneous symptoms including respiratory arrest. We need not further summarize that evidence here.

16

**Custody Credits**

Based on defense counsel's calculation, the trial court awarded Parker 1,185 days of presentence custody credit. Parker contends and the Attorney General concedes he is entitled to 1,186 days of actual custody credit because he was arrested on December 8, 2009 and sentenced on March 7, 2013. On or about August 7, 2013, Parker made a written request to the trial court for correction of his custody credits. As of the date he filed his appellate reply brief, January 23, 2014, Parker had not received notification that the trial court had corrected his credits. In the event it has not done so already, we order the trial court to make the correction.

## DISPOSITION

The trial court is ordered to correct the judgment to reflect that Parker is awarded 1,186 days of actual presentence custody credit. As so modified, the judgment is affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, Acting P. J.

MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17